[Crim. No. 1897. Second Appellate District, Division Two.—June 3, 1930.]

THE PEOPLE, Respondent, v. JAMES J. DAVIS, Appellant.

R. E. Parsons for Appellant.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

GATES, J., *pro tem.*—Appellant and Vincent Berbalas were tried jointly under an indictment accusing them in count 1 of conspiracy to commit robbery and in counts 2, 3, 4 and 5 of the offense of robbery. At the conclusion of the evidence the court dismissed counts 1, 4 and 5 as to both defendants, count 2 as to appellant and count 3 as to Berbalas. Thereafter appellant was found guilty on count 3—the robbery of one Alice Schnauer, cashier of the Mar-Cal Theater, Hollywood, Los Angeles. He appeals from such judgment of conviction and from an order denying his motion for a new trial.

In view of appellant's contention that the evidence presented before the jury is insufficient to sustain the verdict rendered we will give a rather extended statement of such evidence. On the evening of April 8, 1929, between the

hour of 6 and 7:30 the appellant, in company with one "Gazick," now deceased, went to the auto rental place of Nicholas Macela at 1015 West Seventh Street, Los Angeles. Mr. Macela had only two automobiles on the lot at the time for rent, a Buick coupe and a Jordan coupe. After some discussion as to the relative speed of the two cars, during which appellant asked which car was the faster of the two, he rented the "Blue Boy Jordan Convertible Coupe," which car he was told by the proprietor was the faster of the two. He paid the proprietor twenty-five dollars therefor. Appellant then signed his name as "J. J. Daley." Mr. Gazick, who accompanied Davis, was described as being about five feet six inches in height and wearing a gray sweater and a cap. Appellant was dressed in a suit of dark clothes.

About 8:30 of the same evening Miss Schnauer, the cashier of the Mar-Cal Theater, at 6021 Hollywood Boulevard, Los Angeles, was held up while sitting in the box office of the theater. As she was rolling up some of the money that she had collected that evening a person described as about five feet six inches in height and who wore a gray sweater and a cap came into the box office. He pointed a gun at Miss Schnauer, who thereupon screamed and ran to the door of the theater, where she shouted to the door boy that someone was taking her money. One Alexander, a police officer, who was at that time sitting in the theater, heard her. He opened the front door of the theater and saw a man coming out of the box office with a gun in one hand and what looked to be money in the other hand. The officer fired a shot at the robber and then jumped back into the theater, where he remained for a period of thirty to sixty seconds. A man in the street pointed to a Jordan coupe which was parked near the theater, and as he pointed he said, "There they go." Alexander then fired another shot, which went high. He then commandeered an automobile that was going in the same direction as the Jordan coupe, but after a little time lost sight of the latter on a side street leading off Hollywood Boulevard. The scream of the cashier attracted the attention of a man across the street, a Mr. Tate, who saw a man coming out of the lobby of the theater with a gun in his right hand and what resembled money in his left hand. The man fell down several times, stumbled and faltered, but proceeded to go and get into the Jordan coupe which was parked, as

stated before, near the entrance of the theater. As Mr. Tate came across the street to the Jordan coupe, while the holdup man was getting into his car, he saw another man in the automobile. The two told him to go back where he had come from. The floor of the lobby of the theater was bloody and was strewn with money.

At about 9:30 that evening appellant entered a drugstore at 5401 Central Avenue, Los Angeles, and inquired of the soda clerk as to where the doctor was. Appellant at the time was without a coat and there were bloodstains on his shirt. The clerk pointed to Dr. Syer, who at that time was on the opposite side of the store and who had his office above the store. Appellant approached Dr. Syer and told him there was a man in very bad shape who needed medical attention—that the man had been shot—and asked the doctor to go with him at once to see his friend. Dr. Syer asked why he did not take his friend to the receiving hospital. Davis then stated that he did not want to take him there if he could avoid it, as it was an accident, but that if the doctor after seeing him thought it was necessary to send his friend to the hospital they should do it. Thereupon the doctor, in his own car, followed appellant to 973 East Forty-seventh Street, where the latter took the doctor to a shack at the rear of the lot. In this shack the doctor found a man wounded, lying on a bed. His clothing was partly open and covered with blood. Appellant asked the doctor if he thought the man was going to die, and the doctor replied, ''Absolutely.'' Davis then went with the doctor to a neighbor's house, where the latter telephoned to the receiving hospital for an ambulance. The police officers preceded the ambulance. Appellant was standing on the sidewalk when they arrived. He had no coat on and his face was covered with blood. Officer Nolan asked if he was the man who had been shot. Appellant pointed to the rear of the property and said that the man was back there in the shack, leading the officer to the place. The wounded man was lying on the bed and bleeding profusely. The officer asked the wounded man if he had been shot and he said, ''Yes.'' At about that time the ambulance arrived and he was taken to the hospital.

Officer Nolan then asked appellant where he had met the wounded man. Davis stated that as he was coming out of a restaurant on Avalon Boulevard near Vernon Avenue he

bumped into him; that the wounded man said he had been shot and asked him to get a doctor. Appellant also stated that he knew the injured man—that he met him a few days before in town. The officer then asked if appellant or the injured man lived at this shack and appellant said, "No." Asked as to how he knew about the shack appellant stated that he at one time had lived there and that was why he had taken the injured man to the place. Officer Nolan then inquired of appellant as to where the car was in which he had brought the man to the shack. Appellant stated that it was outside, and upon the officer's request to be shown the car Davis took him to the front of the premises, where he pointed to a Jordan coupe. The right-hand side of the seat was covered with blood. There was a pool of blood on the floor of the car and also on the running-board. Thereafter appellant was taken by the officers to the receiving hospital. In the meantime the wounded man, who was later identified as John Gazick, had died. Nolan then asked the appellant as to where the gun was that was used in the holdup and appellant stated that he did not use any gun. Davis was then allowed to see the dead boy and was asked if he was going to put all the blame upon him. Appellant asked if he would be charged with murder. The officer told appellant that he could not be charged with murder because the boy had been killed by a police officer while committing a felony. Appellant then said, "All right, then, I will tell you." Thereupon he told Officer Nolan that he had rented the Jordan coupe under the name of "J. J. Daley"; that he did not have a gun, but that he would show the officer where the gun was that was used in the robbery and the money that was taken in the holdup of the Mar-Cal Theater. A number of police officers and appellant then went to the premises where the shack was located and the latter directed the officers to look for the weapon. Thereafter Officer Alexander found a revolver in a vacant lot on East Forty-seventh Street to the west of the shack in some tall grass alongside of some rubbish—the exact spot designated by appellant, who positively identified the gun as the one used by Gazick in the robbery of the Mar-Cal Theater.

After the gun was found the appellant told Officer Stevens that he would show him where the money was. He then took Officers Stevens and Robbins to the rear of the shack and

lifted up a board from a box, in which there was a blue coat. In the left-hand pocket of this coat a quantity of currency was found, all wadded up in a chunk and saturated with fresh blood. There were some thirty-nine one dollar bills and eleven five dollar bills wadded together. Officer Robbins then asked appellant if the coat was his and the latter said that it was. He was then asked if that was all the money that had been taken from the Mar-Cal Theater and he replied that it was all that he knew anything about. He stated that he thought a Buick car was chasing him when he left the theater, but that he was not in any danger because at one time he was traveling seventy miles an hour. Appellant asked as to who shot his partner, and upon being told that it was an officer, said that he could not understand it because he thought the "kid," Gazick would shoot it out. Testimony was given by Officer Stevens that the number on the revolver identified by Davis had been filed off. The revolver was loaded with five shells. Officer Robinson stated that the gun was found approximately forty feet from the shack, on the vacant lot, and that it could not have been thrown there, for the reason that it was covered over with grass; also that the sidewalk leading from the street to the shack was splattered with blood. He further testified that blood was all over the inside of the shack.

Another officer, Taylor, testified that appellant told him that he and Gazick were driving on the boulevard and stopped just a few feet west of the entrance to the theater; that Gazick got out of the car and went to hold up the theater while he stayed in the car; that he heard shots and Gazick came to the car; that he got out and helped Gazick get into the car; that he then drove away; that another car was following him, but that this car did not have a chance for his car would make ninety miles an hour. The officer then asked appellant why he went to this particular place on the other side of town with the wounded boy, and appellant told him that he used to live there in the shack and that he had to get the boy somewhere in order to do something for him, as the latter was in a serious condition; that he drove to the front of the property, picked up the boy and carried him into the shack; that he hid the gun and the money and then went for a doctor.

Another police officer, Higgins, also testified to a certain confession made by the appellant, which confession was substantially as follows: Davis said he was present at the Mar-Cal Theater holdup and that he had been on three other jobs; he said that they were going along Hollywood Boulevard and as they were about to pass the Mar-Cal Theater a fellow whom he called Jack said, ''I'm going to take this place''; that they stopped and went in and pulled the holdup of the Mar-Cal Theater, and after he was shot that he got out of his car and helped ''Jack'' into the car. Other confessions were made by appellant wherein he admitted his participation in the robbery.

The cashier of the theater identified the deceased, Gazick, as the man that pointed a gun at her. Macela, who rented the Jordan coupe to appellant, also identified a photograph of the deceased as a likeness of the man who was with appellant at the time he rented the car. Officer Alexander, who did the shooting at the theater, identified this photograph as a likeness of the man that he shot.

Practically all of the foregoing facts were corroborated by competent evidence as well as by many incriminating circumstances.

Appellant, who had been convicted of a felony, to wit, the crime of robbery, in San Diego some years ago, took the stand in his own behalf and denied any participation in the Mar-Cal Theater robbery He stated that he had known his co-defendant Berbalas and Gazick for a month and a half or two months. All had roomed together at the same place. He denied the various confessions which he is alleged to have made, and gave his version as to what happened on the 8th of April of last year. He claimed to have left Venice at 2:30 or 3:00 o'clock that afternoon and that he stayed around Central Avenue in Los Angeles until about 5:30 and then met a fellow who owned a Jordan roadster. He stated that this car had quite a knock in it. The car was at a garage. He went to the Ardale Apartments, at Forty-seventh and Central, and they left the car there because they were afraid to drive it in the shape it was in. The friend, who later turned out to be Gazick, asked him to go with him on Seventh Street where they could rent a car. He wanted the defendant to rent the car because he could not speak English very well and he had never rented a car in Los Angeles. He

went there with Gazick and asked the proprietor about the renting of a car. The friend, Gazick, told him that he wanted to use the car, that he had a date with a friend, Mr. Berbalas. The reason appellant rented the car instead of Gazick was that he had references in Los Angeles and Gazick was not known here. He rented the car and paid the cash and left a deposit and was given a slip, which he signed. He turned the car over to Gazick. Gazick took the car to Vernon and Central, where he left Davis at about fifteen minutes to eight. Davis stayed around Central and Vernon, where Gazick was to meet him at about 9 o'clock, but the latter did not show up. In the meantime appellant was at Central and Vernon and there was a party there who had met him at the garage. This party was pointed out in the courtroom and turned out to be the witness Anthony Krajne. Davis went back to the Ardale Apartments between 9 and 9:30. He could not state the exact time, as he did not have a watch. The Jordan coupe, the one that had been rented, was standing there behind the apartment house, Forty-seventh and Central, where "this fellow" generally parked his roadster. He went over to the coupe and opened the door and as he did the man was leaning to one side. He thought he was intoxicated. He asked him what the reason was and the other said, "My God, get me a doctor quick, as I have been shot." He did not talk to appellant any more about being shot or anything about it.

Appellant further testified that he drove the car across the street, about three hundred yards from the corner of Wadsworth and Forty-seventh—973 East Forty-seventh Street. He knocked on the door and a gentleman whom he had known for three years came to the door. He asked him for a bed or a room where he could leave the man, as he was bleeding to death, while he looked for a doctor. He told Davis that he could leave Gazick on the bed. Appellant left the wounded man there and rushed for a doctor. The officers tried to make him confess, but he did not know anything to confess, so finally they gave it up and asked him if he saw a gun and he told them he presumed it was a gun or something that this man had thrown when he took him out of the car, and that it had lit in the grass alongside of the fence by the house where he had taken him. He took the officers there voluntarily and showed them where the gun was—where he

saw the gun thrown—and he, the officer, asked Davis if there was any money. He told the officer that when he took the man out of the car he had handed him some money, but he did not know how much there was as the money was in his coat pocket which he had laid on the bench by the side of the house. He further stated that he could not drive an automobile by reason of some eye affliction, and that it had been a number of years since the last time he had driven an automobile.

Appellant endeavored to establish an alibi by the witness Anthony Krajne, who testified in substance as follows: That he is a marine engineer and lives at 694 South Rio Street, Los Angeles. On the evening of April 8th, which was Monday, he worked until 5 o'clock and then went down to Sixty-eighth and Central Avenue to Paul's Service Station. He was getting gas down there. His son was running the gasoline station. He left the station at 8:15. The reason he knew it was 8:15 was because he looked at the Goodyear clock at the Goodyear Tire and Rubber Company plant. He saw Mr. Davis. He was at Vernon and Central, in front of the Allen drugstore, on the northeast corner. He, Krajne, excused himself for running into and knocking Davis; looked him in the face; had seen him prior to that time; had seen him several times on previous occasions—the previous Saturday over at Emil's Garage, Fifty-sixth and Central.

As to appellant's claim of insufficiency of the evidence to sustain the verdict, it may be said that if "Gazick," who is now deceased, defendant's friend and partner, were appealing to this court from a judgment of conviction upon the evidence contained in the record now before us, we would ineluctably hold that this evidence establishes his guilt beyond all reasonable doubt, because all the necessary elements of first degree robbery: the felonious taking—an intent to steal (*People* v. *Keefer*, 65 Cal. 232, 233 [3 Pac. 818]; *People* v. *White*, 5 Cal. App. 329 [90 Pac. 471]; *People* v. *Foss*, 85 Cal. App. 269 [259 Pac. 123]); the ownership of the property (*People* v. *Anderson*, 80 Cal. 205 [22 Pac. 139]; *People* v. *Remington*, 74 Cal. App. 371 [240 Pac. 526]); the taking from the immediate presence of the one in possession, Miss Schnauer, of the money (Pen. Code, sec. 211; *People* v. *Stevens*, 141 Cal. 488 [75 Pac. 62]; *People* v. *Sylvis*, 72 Cal. App. 632 [237 Pac. 802]) by force and fear (*People* v.

*Wilson,* 119 Cal. 384, 386 [51 Pac. 639]; *People* v. *Sharp,* 58 Cal. App. 637 [209 Pac. 266]; *People* v. *Ortega,* 7 Cal. App. 480 [94 Pac. 869]), and the perpetration of the crime by a person armed with a dangerous and deadly weapon (*People* v. *Seawright,* 72 Cal. App. 414 [237 Pac. 796]; *Lipscomb* v. *State,* 130 Wis. 238 [109 N. W. 986]; *People* v. *Shaffer,* 81 Cal. App. 752 [254 Pac. 666]; *People* v. *Freeman,* 86 Cal. App. 374 [260 Pac. 826]; *People* v. *Egan,* 77 Cal. App. 279 [246 Pac. 337]; secs. 211, 211a, Pen. Code) have been positively, definitely and overwhelmingly proven.

Independent of the many incriminating acts of the defendant and of the surrounding circumstances, and after *prima facie* proof of the *corpus delicti,* the confessions of the defendant, which were freely, voluntarily and deliberately made and identified, would have been sufficient in themselves, as substantive evidence of guilt of a most satisfactory character, to warrant a verdict of guilty. (*People* v. *Ford,* 25 Cal. App. 388 [143 Pac. 1075]; *People* v. *Jones,* 32 Cal. 80; *People* v. *Richardson,* 161 Cal. 552 [120 Pac. 20]; *People* v. *Vuyacich,* 57 Cal. App. 233 [206 Pac. 1031]; *People* v. *Ruef,* 57 Cal. App. 230 [206 Pac. 775].) The weight of the evidence and the credibility of the witnesses are questions for the jury to determine. (22 Cal. Jur. 871, and cases there cited.)

As to appellant's alibi, we may repeat what was said in *People* v. *DeVerre,* 68 Cal. App. 742, 744 [230 Pac. 197, 198]: "The defendant's story is plausible, but the jury had the advantage of the presence of the defendant and evidently came to the conclusion that the recital of what took place lacked the essential element of truth." (See *People* v. *Seawright, supra,* pp. 417, 418.)

How can it be said after a careful examination of all of the evidence before us that appellant, who was prosecuted as a principal under sections 31 and 971 of the Penal Code, is not guilty of the crime of first degree robbery? In concluding appellant's first point we may say here, as was said by this court in the recent case of *People* v. *Clensey et al.,* 97 Cal. App. 71, 76 [274 Pac. 1018, 1020], that "it cannot be seriously questioned that the testimony amply supports the determination of the jury, when we bear in mind the oft-stated rule prevailing in California, codified in section 971 of the Penal Code, that there is no distinction between an accessory

before the fact and a principal. ˙ Here the actual robbery is not in dispute, nor can it be successfully argued that the appellants were not found to be in possession of the stolen property, which together with their admissions, renders almost impossible any other conclusion than that they were instrumental in plotting and bringing about the commission of the crime, although they may not have actually participated in the physical acts of the robbery.''

Appellant contends that the trial court erred in permitting the introduction in evidence of the gun found on the premises in East Forty-seventh Street on the night of April 8th and identified by him as the gun used in the robbery of the Mar-Cal Theater, over the objection of defendant's counsel. Appellant cites in support thereof the well-known case of *People* v. *Mullen,* 69 Cal. App. 548 [231 Pac. 588]. The facts in *People* v. *Mullen* are not analogous to the facts in the instant case. In that case, which was a prosecution for robbery, there was admitted in evidence, over defendant's objection, a pistol and some cartridges which were tossed, at the time of defendant's arrest and after the robbery, by another who was riding with defendant in an automobile, into the tonneau of the car, which objects were not identified as having any connection with the robbery. It was not even shown that the defendant knew that his companion had a revolver or cartridges. In the instant case the revolver was positively identified by appellant as the one used by Gazick in the Mar-Cal Theater holdup. He, Davis, pointed out this revolver to the police officers and showed them where it was hidden. It was conclusively shown that this was the same weapon. Nor is the instant case like *People* v. *Smith,* 55 Cal. App. 324 [203 Pac. 816], cited by appellant. In that case, where the defendant was charged with murdering his wife by means of cyanide administered to her, it was not shown that the defendant had ever seen or had any knowledge of the can of cyanide. It is a well-settled principle of law that instruments of crime may be admitted in evidence after they have been identified, *prima facie,* as those with which the crime was committed. (*People* v. *Miller,* 177 Cal. 404 [170 Pac. 817] ; *People* v. *Stoerkel,* 87 Cal. App. 336 [262 Pac. 825] ; *People* v. *Hale,* 81 Cal. App. 734 [254 Pac. 639] ; *People* v. *Ferdinand,* 194 Cal. 555 [229 Pac. 341] ; *People* v. *Smith,* 74 Cal. App. 510 [241 Pac. 267].) There was no

error in admitting the revolver, as it was clearly shown that the crime had been committed with the aid of the identical weapon offered and that defendant was within a few feet of the theater when the crime was committed. (8 Cal. Jur. 145; *People* v. *Sansome,* 84 Cal. 449 [24 Pac. 143] ; *People* v. *Hope,* 62 Cal. 291; *People* v. *Winters,* 29 Cal. 658.) The admission of the revolver and the cartridges was a necessary link in the People's chain of evidence.

■ As to appellant's claim that the bloody shirt, as well as the coat and vest worn by him on the night of April 8th, were erroneously admitted in evidence over the objection of his counsel, these articles were positively identified by one of the police officers as having been worn by Davis on the night in question. The federal case of *Sorenson* v. *United States,* 168 Fed. 785, does not aid appellant in his contention, for the reason that it appears in that case that it was not shown that the articles in possession of the defendant were used in the commission of the burglary nor that the defendant was in the vicinity at or near the time of its commission. Likewise, in the case of *Hauger* v. *United States,* 173 Fed. 54, cited by appellant, there was nothing in the evidence to connect the defendant with the counterfeit coins exhibited to the jury. The rule regarding the admissibility of articles of clothing is well settled. 8 California Jurisprudence, 145, clearly states it as follows: ''Wearing apparel of the accused is admissible in evidence, provided some connection between it and the accused, and between it and the supposed crime is shown.'' (See *People* v. *Nakis,* 184 Cal. 105 [193 Pac. 92] ; 16 Cor. Jur. 549, sec. 1053.) Defendant Davis admitted hiding the coat which contained the money from the robbery. He admitted that it was his coat. The shirt admitted in evidence was the one worn by him on the night of April 8th. All of these articles were relevant and pertinent and were properly admitted.

■ Appellant makes the claim that photographs taken of Gazick at the morgue were improperly admitted. These photographs were offered for the purpose of establishing the identity of the deceased as the one who committed the crime. The rule is well settled that photographs may be admitted even though they may tend to awaken feelings of horror and indignation in the minds of the jury. (8 Cal. Jur. 137, 138; 16 Cor. Jur. 744; *People* v. *Saenz,* 50 Cal. App. 382 [195

Pac. 442]; *People* v. *Balestieri,* 23 Cal. App. 708 [139 Pac. 821].) They are also admissible in evidence to show identity. (22 C. J. 915; *People* v. *Durrant,* 116 Cal. 179, 213 [48 Pac. 75].)

Judgment and order affirmed.

Craig, Acting P. J., and Thompson (Ira F.), J., concurred.