[Crim. No. 6366. Second Dist., Div. One. June 29, 1959.]

THE PEOPLE, Respondent, v. HARRY TREGGS, Appellant.

Harrison M. Dunham, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, defendants were charged with the crime of robbery (Pen. Code, § 211) in that they took $3,400, and a quantity of whiskey of the value of $54 from Maurice Terk, one of the proprietors of a liquor store and market. Appellant Treggs was also accused of a prior felony conviction for violation of section 470 of the Penal Code, and of being armed with a revolver at the time of the robbery. The prior conviction was admitted. Appellant pleaded not guilty and the cause was tried before a jury which returned a verdict finding him guilty of robbery of the first degree, and that he was armed at the time the offense was committed. At the time judgment was pronounced the court found that appellant was not armed at the time of the commission of the offense and sentenced him to state prison. From the judgment and the order denying his motion for a new trial appellant prosecutes this appeal.

An examination of the record reveals the following as a fair statement of the factual background surrounding this prosecution.

At approximately 8:30 p.m. on the evening of October 20, 1957, the Rite-Way Market and Liquor Store in Los Angeles County was robbed by a group of men.

Ann Terk, a coowner of the store, was the first to observe them. She was standing by the cash register at a long counter that ran the length of the 70 by 150-foot store, to the right as you come through the entrance. She thought four men entered the store. ''One man went next to the candy counter to my left; two men approached me in front of the cash register, right in front of me. It was my impression that there was a fourth man that walked toward the coke machine, that came in with this group; and then I don't recollect seeing him again.''

When the men walked over to Ann Terk, her brother Maurice Terk, a coowner, was standing about 8 feet away by the candy counter, stocking it.

One of the men asked Miss Terk for cigarettes.

''When one man asked me for a package of Winstons, I turned around to get it; the other fellow that was with him, that was directly in front of me, went over to the candy display close to my brother. I thereupon got the Winstons, rang up the sale; and when the cash register was opened, the man that was on my left came around by the cash register right

next to me and put a gun into my ribs. He said, 'This is a holdup.' ''

Maurice Terk's attention was attracted by the statement, and he saw three men. He was told to walk to the back of the store by the gunman, and either to "hurry up" or "go to the back." He complied.

After Ann Terk observed the gun and heard the announcement of the holdup she backed away and rang a burglar alarm. She was told to come forward, around to the other side of the counter, and to go in the back room of the store with her brother. Both were told to lie down.

Maurice Terk testified that after they assumed this position his sister was taped. Her ankles were taped, her wrists were taped behind her back and some tape was put over her mouth. A voice told Maurice Terk in the darkened back of the store to come forward to the money order section. Under gunpoint the money order section was forced open, when Terk was taken back to the safe. "The fellow that was behind me couldn't get the safe open, and I had to do it," Terk testified. Then Terk was brought forward to the money order section and told to lie on the floor next to three customers in the store. The men took $3,400, and $54 in whiskey.

Maurice Terk was sure that Harry Treggs was not in the store at the time of the robbery, and that he did not see him that day at all, though he knew Treggs as a customer. Nor could Terk's sister, Ann, place Treggs at the scene, though she thought the gunman looked somewhat like him, however "I don't think he is the man though."

Maurice Terk described his opportunities to see the men. When the holdup began he was aware of someone behind him and glanced around, but not completely, just turning his head about 90 degrees, and keeping it there for two or three seconds. He faced the back of the store.

Then he looked again to the cash register where his sister stood. He saw a Negro with a gun, his back towards Terk, but he never saw his face. He saw another man too, but kept his attention on the gunman, concerned for his sister's welfare.

Then he walked to the rear of the store, with no opportunity for a further look into the dark rear of the store, set off by a swinging door. When he was brought to the money order section that too was dark, though he got a glance at the man who brought him there. During the two or three minutes in the money order section, by the light from a window in the darkened room, he got a profile view of the man who was

opening the money order drawer, though he noticed no unusual facial characteristics.

Next they went to the safe, Terk followed by a man, who, his back to Terk, tried to open the safe but couldn't, and had Terk do it. Terk had no chance to view anything on his way back to the money order section and when he got there, lying on his stomach, he saw nothing.

Terk thought that appellant Treggs' codefendant Huey Owens was the man behind him, but he couldn't positively identify him. Ann Terk named Huey Owens as "the one close to my brother at the candy counter."

Miss Terk saw the men when they came into the store "in a group." One of the four she couldn't describe "because he didn't come close to me," but she did notice that there was a fourth one who went to the coke machine, to the left of the store as you enter, and opposite from the counter where Miss Terk stood. Frightened, watching the gun when told of the holdup, she managed to notice that the gunman had kinky hair and wrinkles in his forehead. Then when they made her go to the rear she no longer faced them and she had no further chance to observe.

Before she went back, she noticed that the man near her brother and one of the men near herself "looked like brothers or relatives." They "had the same facial characteristics." The one near her "was a little shorter, a little heavier, had a mustache . . . Hair looked very similar. Wearing a blazer." Both men had "rounder faces." The one who asked for the Winstons "had a little broader face, had a mustache." She observed the man behind her brother for 40 or 50 seconds. She admitted that it was harder for her to distinguish colored people at the time of the offense than at the trial, as she had since acquired experience.

None of the customers were able to make an identification. Arthur Dominguez, a carpenter, who was in the store at the time of the robbery, said he did not recognize the appellant, that he saw three colored men in the store, but he couldn't say how they were dressed. "I'm just not sure" about Treggs, he said. But he thought he recognized Owens.

Bill Rody, a customer, who was unaware of the robbery, did not see anyone involved in what went on in the market.

Sergeant Aure of the Los Angeles Sheriff's Office testified to a conversation between himself, Treggs, and Sergeants Human and Thill of the sheriff's office. Sergeant Aure said

appellant's statements were made freely and voluntarily, with no promises of reward or hope of immunity.

Sergeant Aure told Treggs he would turn him over to the Los Angeles Police Department.

"... At this time he (appellant) requested that I file the robbery count of the Rite-Way Market at 63rd and Holmes. I asked him—at this time I told him, 'Well, I can't even prove that you were there.' I said, 'There's no one that can identify you.'

"He said, 'I don't care. I want you to handle the case.'

"I then asked him, 'Well, where were you in the store?' And he says, 'I went over and stood behind the candy counter while the other fellows went to the back of the store.'"

Sergeant Aure asked appellant Treggs how much money they obtained and he said approximately $385, of that Treggs' share was $100.

Sergeant Aure also showed Treggs a gun which the latter said looked like the one they used in the robbery. He thought that was the gun. Ann Terk testified, "It looks like the same gun except it was a different color. It looked yellowish when I saw it." But she conceded her inexperience with firearms. Maurice Terk called it "identical except for one respect"—"that the one that I noticed appeared to be yellower, as though it had been rusty and cleaned."

Sergeant Human of the sheriff's department repeated Sergeant Aure's story, saying that Treggs admitted his presence at the robbery, said he received $100 of the stolen $385 and that he was in the background and doubted if the victims saw him. Sergeant Human said that when Aure told appellant Treggs there was no identification on him, Treggs responded, "'Well, I didn't expect you to, because I've been in that place enough and I knew they'd recognize me, so I stayed behind—or stayed in the background,' I believe his words were, 'stayed partly hidden.' I'm not exactly sure verbatim what he said."

According to Sergeant Thill of the sheriff's office, he too was present at the conversation and he also heard Treggs say he was in the store, and that they took about $400, but that he stayed in the background.

Sworn as a witness in his own behalf appellant testified that he did not enter the Rite-Way Market and Liquor Store at any time on October 20, 1957, and that the first knowledge he had that a robbery was committed there on said date was when he was questioned at the Firestone sheriff's station. He further testified that he was a customer of the market. That he was

first told of the robbery by the sheriff's deputies about November 26, 1957, some five or six weeks after the robbery here in question. With regard to the foregoing statements attributed to him by Sheriff's Sergeant Aure, appellant denied making them. His version of the conversation was that the officer said, ''Well, I have you on an armed robbery but it's poor identification.'' Appellant testified he said to the officer, ''I would be a fool to go to the Rite-Way Market and rob some people that know me.'' That the officer then said that, ''. . . he was going to file two counts of armed robbery and I told him to go ahead and file them that we'd be going to court for quite a while because I'm not guilty of it.'' Appellant also denied making the statements testified to by Deputy Sheriffs Thill and Human.

Appellant concedes the time honored rule that an appellate tribunal is bound to consider the evidence adduced in the trial court in a light most favorable to the respondent, and that all intendments are in favor of the judgment (*People* v. *Shannon*, 28 Cal.App.2d 677, 680 [83 P.2d 302]), and that this court ''will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt, . . . and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal on the ground of insufficiency of the evidence it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.'' (*People* v. *Newland*, 15 Cal.2d 678, 681 [104 P.2d 778].) However, he urges that in the case at bar, ''There is no scintilla of evidence that establishes the appellant's presence in the Rite-Way Market and Liquor Store on October 20, 1957, at the time the robbery was committed.''

It is also an established rule of law that where the evidence, viewed in one light, creates a hypothesis inconsistent with guilt, and when viewed in another light such evidence is reasonably consistent with guilt, and where the jury rejects the hypothesis pointing to innocence, and there is substantial evidence to support the implied finding of guilt, this court is bound by the finding of the court below. It is therefore axiomatic that an appellate court may set aside the verdict of the jury only when there is no *substantial* or credible evidence in the record to support it, or where the evidence

relied upon by the prosecution is so inherently improbable or false as to be incredible. We are satisfied that the instant case does not present such a situation.

Three deputy sheriffs testified to admissions made to them by appellant wherein he admitted his presence at the scene of the robbery and his participation therein, saying, ''I went over and stood behind the candy counter while the other fellows went to the back of the store.'' Such statements and admissions as were made to the officers were sufficient to establish his identification as one of the participants in the crime (*People* v. *Silva,* 143 Cal.App.2d 162, 169 [300 P.2d 25]). Appellant does not question the fact that the corpus delicti was established. It is the law that upon proof of the corpus delicti by evidence other than the admissions of an accused, he may be convicted on his own confession or admissions. (*People* v. *Davis,* 106 Cal.App. 179, 188 [289 P. 194]; *People* v. *Hammond,* 26 Cal.App.2d 145, 150 [78 P.2d 1172].)

Appellant asserts that the testimony of the victim of the robbery and that of a customer in the market establishes that he was not one of the robbers. It is true that these witnesses could not identify appellant as one of the men present in the store. However, their opportunity for identification was limited and the emotional stress under which they were laboring at the time would of necessity make accurate identification difficult. Appellant in his statements to the officers said he stayed in the background, because he had been in the place before and feared recognition. The jury could have inferred from his statement that appellant was the fourth man observed by Ann Terk and at whom she did not get a ''good look.'' And whatever weaknesses appear in the identification testimony, appellant himself admitted participation in the robbery. He further urges that the difference in the amount of money taken as testified to by the owner ($3,454), and his statement that the robbery netted only $385, indicates that he had ''no knowledge of the facts of the robbery.''

While this argument may appear plausible, still it is unavailing on appeal. The jury may well have concluded that either appellant in his statement to the officers was attempting to minimize the actual amount taken in the robbery or that his accomplices ''held out'' on him. It is inherent in the verdict that the jury did not believe the testimony given by appellant at the trial, but chose to believe the testimony of the officers as to appellant's statements to them, wherein he ad-

mitted his participation in the robbery regardless of the amount of money taken.

Appellant next characterizes the testimony of the officers as "contrived and fabricated." Since no charge of perjury by the witnesses against appellant is presented by the record, the question is not properly before us (*People* v. *Martin*, 128 Cal.App.2d 361, 364 [275 P.2d 635]).

What appellant is apparently seeking is for us to retry the case. This we cannot do. The question of credibility of witnesses and apparent inconsistencies between the statements of witnesses are all within the province of the duly constituted arbiters of the facts, and unless testimony can be said to be inherently improbable, an appellate tribunal will not interfere with a jury's determination of the credibility of witnesses where the evidence is in conflict (*People* v. *Newland, supra*, p. 681). In the instant case, the jury was entitled to believe the testimony of the officers and to reject that of appellant if they conscientiously felt warranted so to do, and as well, to determine the intrinsic value of testimony of identification. The determination of the jury was also fortified by the action of the trial judge in denying a new trial.

Appellant relies upon the cases of *People* v. *Draper*, 69 Cal. App.2d 781, 786 [160 P.2d 80], and *People* v. *Gibbons*, 93 Cal.App. 2d 28 [208 P.2d 411], wherein it was held that the evidence was insufficient to sustain the burden resting upon the prosecution to establish guilt beyond a reasonable doubt. The evidentiary features of these cases are at once distinguishable from the facts presented in the case now engaging our attention, in that appellant herein made admissions to the officers that he was not only present at the scene of the crime, but was a participant therein.

The judgment and the order denying defendant's motion for a new trial are, and each is affirmed.

Fourt, J., and Lillie, J., concurred.