[Crim. No. 7544. Second Dist., Div. Two. Dec. 29, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK G. WATSON, Defendant and Appellant.

---

[1]See *People* v. *Jackson,* 191 Cal.App.2d 296 [12 Cal.Rptr. 748].

Gladys Towles Root and Eugene V. McPherson for Defendant and Appellant.

Stanley Mosk, Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

ASHBURN, J.—Convicted of first degree murder and sentenced to life imprisonment, defendant Frank G. Watson

710

appeals from the judgment. He did not testify or call any witnesses in defense. The main argument of his present counsel is that the corpus delicti was not proved without the aid of defendant's own admissions and hence the evidence is insufficient to support the verdict.

The prosecutor and the court carefully adhered to the rule that prima facie proof of the corpus delicti should be made before receiving evidence of any confession or admission of the defendant.[1] In examining sufficiency of the evidence to make such prima facie showing it is well to keep certain well settled applicable principles in mind.

The corpus delicti of murder consists of death of the alleged victim and existence of some criminal agency as the cause thereof. Proof of corpus delicti does not require identity of the perpetrator of the crime and it may be proved circumstantially or inferentially. (*People* v. *Cullen,* 37 Cal.2d 614, 624 [234 P.2d 1]; *People* v. *Cobb,* 45 Cal.2d 158, 161 [287 P.2d 752]; *People* v. *White,* 186 Cal.App.2d 853, 857 [9 Cal.Rptr. 99].) "To prove a *prima facie* case of *corpus delicti,* all that was required was to show a reasonable probability that a criminal act of another had been the direct cause of the death. . . ." (*People* v. *Ives,* 17 Cal.2d 459, 464 [110 P.2d 408].) To the same effect are *People* v. *Williams,* 151 Cal.App.2d 173, 179 [311 P.2d 117]; *People* v. *Ogg,* 159 Cal.App.2d 38, 47 [323 P.2d 117]; *People* v. *Toth,* 182 Cal. App.2d 819, 824 [6 Cal.Rptr. 372]; *People* v. *King,* 132 Cal. App.2d 642, 647 [282 P.2d 923]; *People* v. *Black,* 103 Cal. App.2d 69, 75 [229 P.2d 61]; Fricke on California Criminal Law (7th ed.) page 24.

After such proof is made the confessions and admissions of defendant are admissible in evidence and may be weighed in conjunction with all other evidence to determine whether the corpus delicti and other elements of the crime have been proved beyond reasonable doubt. *People* v. *Gem Hang,* 131 Cal.App.2d 69, 71-72 [280 P.2d 28] puts the matter succinctly as follows: "Extrajudicial admissions of a defendant can be used against him when there is independent prima facie evidence of the corpus delicti. [Citations.] Slight proof

[1]This rule is not without exceptions dictated by the discretion of the trial judge (*People* v. *Cullen,* 37 Cal.2d 614, 625 [234 P.2d 1]; *People* v. *Scott,* 176 Cal.App.2d 458, 502 [1 Cal.Rptr. 600]; Fricke on California Criminal Evidence (5th ed.) p. 99; Witkin on California Evidence, § 242, p. 276; 19 Cal. Jur.2d §§ 492-3, pp. 259-61; 48 Cal. Jur.2d § 371, p. 372), but, as will appear, the prosecutor was well advised to adhere strictly to the rule in this case.

of the corpus delicti is sufficient for this preliminary purpose. [Citations.] . . . When in this manner the admissions had become admissible they were sufficient to raise the quantity of proof beyond a reasonable doubt.''

In *People* v. *Selby,* 198 Cal. 426, 432 [245 P. 426], defendant requested and the court denied an instruction containing this language: '' 'With respect to the proof of the *corpus delicti,* I instruct you that in determining that question you must not consider any evidence of alleged confessions, admissions or statements of the defendant. Evidence of alleged confessions, admissions and statements may not be considered for any purpose until you have first satisfied your minds to a moral certainty and beyond a reasonable doubt that the deceased came to her death through the unlawful act of some person other than herself. . . .' '' Upholding this ruling the court said in part at page 433: ''In our view the requested instruction did not contain a correct statement of the law and it was therefore properly refused. Preliminarily, it should be kept in mind that there is a sharp distinction between the rule governing the *admission* of extrajudicial statements, admissions or confessions and the rule governing the jury in its *consideration* of such evidence after it is admitted. Concerning the *admissibility* of extrajudicial statements, admissions or confessions it has been correctly declared that 'Proof of the *corpus delicti* of the conclusive and convincing character required to support a conviction of the crime charged was not a prerequisite to the reception in evidence of the extrajudicial statements of the defendant that he had killed the deceased. *Prima facie* proof of the *corpus delicti* was sufficient for that purpose; and it was not essential to the proof and purpose to show that the crime charged was committed by the defendant.' (*People* v. *Wagner,* 29 Cal.App. 363 [155 P. 649].) (Italics added.)'' And at pages 438-439: ''It may finally be said that the authorities are unanimous on the proposition that the *corpus delicti* is not required to be established to a moral certainty and beyond a reasonable doubt before the extrajudicial statements, admissions, or confessions of a defendant may be received in evidence—*prima facie* proof of the *corpus delicti* being sufficient for that purpose. And, with the exception of *People* v. *Tapia, supra* [131 Cal. 651 (63 P. 1001)], and *People* v. *Wagner, supra,* the rule is likewise unanimously declared that it is *not* necessary that the jury in resolving the question of the guilt or innocence of a defendant upon all the evidence in the case should, before

considering for any purpose the extrajudicial statements, admissions, or confessions of a defendant, be first satisfied to a moral certainty and beyond a reasonable doubt that the *corpus delicti* has been established by evidence *aliunde.*

''When the case is submitted for their verdict the jury may consider *all* the evidence in the case, including the extrajudicial statements, admissions or confessions of the accused, in determining whether or not all the elements of the offense charged and the connection therewith of the accused have been established to a moral certainty and beyond a reasonable doubt. If this were not the correct rule, proof of the extrajudicial statements, admissions, or confessions of the accused would have no utility except to connect him with the crime charged. The general rule is that unless evidence is admitted for a limited purpose it will be considered for every purpose. Any expressions in *People* v. *Tapia, supra,* and *People* v. *Wagner, supra,* to the contrary of what we have declared are at variance with the authorities and are not binding. It follows from the foregoing that the proposed instruction was erroneous and was, therefore, properly refused.'' Numerous authorities announce and apply the same rule. (*People* v. *Powell,* 34 Cal.2d 196, 203 [208 P.2d 974] ; *People* v. *McMonigle,* 29 Cal.2d 730, 738-740 [177 P.2d 745] ; *People* v. *Dessauer,* 38 Cal.2d 547, 551 [241 P.2d 238] ; *People* v. *Hardy,* 33 Cal.2d 52, 60 [198 P.2d 865] ; *People* v. *Duncan,* 51 Cal.2d 523, 528 [334 P.2d 858] ; *People* v. *Scott, supra,* 176 Cal.App. 2d 458, 491-492; *In re Flodstrom,* 134 Cal.App.2d 871, 875 [277 P.2d 101] ; *People* v. *Day,* 71 Cal.App.2d 1, 4-5 [161 P.2d 803] ; *People* v. *Harshaw,* 71 Cal.App.2d 146, 149 [161 P.2d 978] ; *People* v. *Wilde,* 82 Cal.App.2d 879, 883 [187 P.2d 825] ; *People* v. *Johnson,* 105 Cal.App.2d 478, 486 [234 P.2d 116].) █ As the ''purpose of the rule is to protect the defendant against the possibility of fabricated testimony which might wrongfully establish the crime and the perpetrator'' (*People* v. *Cullen, supra,* 37 Cal.2d 614, 625) it follows that defendant's admissions or confession are competent evidence after prima facie proof of the corpus delicti is made and may of themselves be sufficient to establish his connection with the crime. (*People* v. *Richardson,* 161 Cal. 552, 563 [120 P. 20] ; *People* v. *Ford,* 25 Cal.App. 388, 419 [143 P. 1075] ; *People* v. *Vuyacich,* 57 Cal.App. 233, 236 [206 P. 1031] ; *People* v. *Ruef,* 57 Cal.App. 230, 233 [206 P. 775] ; *People* v. *Davis,* 106 Cal.App. 179, 188 [289 P. 194] ; *People* v. *King,* 30 Cal.App. 2d 185, 195 [85 P.2d 928] ; *People* v. *Eddy,* 123 Cal.App.2d

826, 831 [268 P.2d 47] ; *People* v. *White, supra,* 186 Cal.App. 2d 853.)

Viewed in the light of these principles the evidence leaves no room for substantial doubt as to its sufficiency. First as to the prima facie showing of the corpus delicti, the record shows the following:

William John Freyer, age 30, lived with his mother, Tiellie Freyer, in Chicago for some months prior to the time mentioned in the information, February 15, 1955; i.e., since the fall of 1954. He had two children, one named Beryl Ann by his first wife and one named Beverly by his second wife, Laberta. Beryl Ann, 6 years old, lived with his sister, Mrs. Gertrude Page, a few blocks from his mother's home. Beverly was with her mother, Laberta, in California. Freyer, before leaving Chicago on February 11, 1955, stopped to see Beryl Ann every day on his way home from work and sometimes again in the evening. He loved both daughters and was very affectionate toward them. Before leaving on February 11, he told his mother he was going to California to pick up Beverly, to get her from Frank Watson. Watson was then living with Freyer's wife, Laberta. On that same evening Freyer was at Mrs. Page's home and asked Beryl Ann if she remembered Beverly, said he was going to California to bring her back, would fly out and return with Beverly in a few days. He spoke affectionately about Beverly and seemed pleased and happy in the thought of going to get his child. Mrs. Page said she could not keep Beverly and he said he had a place for her. He appeared to be healthy and did not seem worried. Owner of a Mercury automobile, he had it cleaned and polished and put in a garage before leaving. Also told his mother to get some applications for a new license. He had three live chinchillas which he left with his mother, telling her how to feed and care for them. Dressed in his good suit and overcoat, he carried a zipper bag, and took only a few articles of clothing. Freyer was a journeyman electrician and member of local lodge 134 in Chicago. His tools were heavy and were kept at home but usually taken with him when going to another locality to work. On this occasion they were left with the mother. Up to the time of his departure from Chicago he had paid Mrs. Page weekly and regularly for the support of Beryl Ann but she never received anything from him after February 11, nor did she hear from him in any way. Customarily he would write or telephone his mother occasionally

when away on a job. But she never heard from him after February 11. He had belonged to the union for years and had built up pension and insurance rights, his daughter Beryl Ann being the beneficiary of the insurance. His dues were paid through January 1955, and had to be kept current in order to preserve the pension and insurance rights. He paid nothing after leaving Chicago on February 11, 1955.

Freyer married Laberta late in the year 1950 and Beverly was born in October of that year. From that time until he and Laberta separated in 1954 he lived in California. Upon separating from her he went to his mother's home in Chicago where he lived until February 11, 1955. Laberta kept the child, Beverly.

On February 12, 1955, he arrived at the home of his sister, Mrs. Bertha Ungefug, who resided in Los Angeles County, having advised her he was coming to pick up Beverly. Mrs. Ungefug testified without objection that he was supposed to have some arrangement made that he was to get her and was going to take her to Chicago; also that he expected to find work in Las Vegas for a short period in order to carry him on to Chicago. He stayed with Mrs. Ungefug from the 12th to the 15th and was out every evening for some time. On the 15th she drove him into Pasadena to meet appellant Watson; he was not sure where Watson would be so she dropped him at San Gabriel and Colorado Streets. This was about 7 or 8 p.m. He said he was going to the corner of First and Huntington in Arcadia to meet Frank who was going to take him to Bertie (Laberta) and he was to get Beverly. Mrs. Ungefug asked if he was going to Las Vegas when through "tonight" and he said, "Yeah." He asked her to drive him but she declined and he took a cab. She last saw him leaving in that vehicle and never heard from him again. He appeared to be healthy, was in a pleasant frame of mind with the thought of picking up his daughter; he was very happy about that.

George Coble worked at Arcadia Metal Products in February 1955, as did appellant. In that month he sold to appellant a Japanese or oriental revolver, a .32 or .38, for which appellant paid cash. There were no shells in it and Coble did not sell him any. The personnel records of Arcadia Metal Products disclosed that Watson on that February 15, 1955, was working on a shift that would end at 11:40 p. m., but he checked out at 7:45 p. m.

About 12:45 a. m. of February 16, Arcadia Police Officer Lawrence Maxson and another officer were on patrol near

Monrovia Nurseries just north of Highway 66. When they were within the grounds, the headlights of their car showed another automobile parked about 85 yards north of Foothill Boulevard and some 75 yards from them. It was a dark night and by using their spotlight to search the area they discovered a man and a woman standing in some shrubs. When the spotlight hit them they walked over to the police car and identified themselves as Frank Watson and Mrs. Watson (a fictitious name as far as she was concerned). One of them said they had been having domestic troubles and he had chased her out there in a quarrel but ''everything was all right at that time.'' This satisfied the officers and they left. Officer Maxson had been interested in whether they had any shrubbery in the car; seeing none he concluded there was nothing suspicious and drove away.

Mrs. Ungefug filed a missing persons report with the Temple City substation of the sheriff's office. Though it was circulated through an all-points bulletin and in Las Vegas, where inquiries were made by the sheriff at the local electricians' union, the gambling casinos in the City of Las Vegas and surrounding Clark County, the water department, the telephone and power companies, no information was obtained about Freyer from any of these possible sources.

By February 20, 1960, the investigating officers had learned from some source the approximate location of the burial of Freyer's body and on that date they repaired to a location in the desert near Palm Springs. They took with them in custody the appellant but the evidence on this phase of the case, prima facie corpus delicti, does not show any speech or activity on his part. After searching the area, a desert wash, for awhile, one of them found a human fibula and another a femur bone. The latter was partially buried in sand and partially under a bush; the former was lying on the ground in the open. Both showed evidence of weathering and the femur was not complete in length. These bones were carefully preserved and were submitted to Dr. Gerald K. Ridge, a well-qualified forensic pathologist. He identified them as human bones of an adult male of estimated height of more than 5 feet 7 inches or 5 feet 8 inches, one from the right leg and the other from the left, consistent with being bones of the same person. (Freyer's height was 6 feet to 6 feet 1 inch.) After comparing them with X-rays known to be those of Freyer, Dr. Ridge testified that there was nothing to rule

the femur out as being the left femur of Freyer. He also said that these bones had weathered for a considerable time, from two to three years up to eight to ten years, could be five years.

At this point a marriage certificate of Frank Watson and Laberta Carney (Freyer) showing marriage on November 12, 1955, was offered in evidence. Defendant raised the objection that no proof of corpus delicti had been made; the court overruled it and the certificate was received in evidence. The ruling was correct.

█ William Freyer, father of two girls whom he appeared to love very much and toward whom he displayed considerable affection, left his place of residence in Chicago declaring his intention to go to California to get his daughter Beverly, who was with her mother Laberta, from whom Freyer was separated. He manifested pleasure in the thought of having Beverly with him and said he would be back in a few days. His automobile, his heavy tools and his live chinchillas were left with his mother. He was never seen again by his mother or his sister, Mrs. Page, nor did either of them hear from him in any way. Though he had paid Mrs. Page regularly for Beryl Ann's support, no further monies were received from him. When away from home he was accustomed to write or call his mother periodically, but this he never did after leaving on February 11. His union pension rights and his insurance which he had carried for Beryl Ann lapsed for nonpayment of dues. There was no known incentive for him to disappear voluntarily. Arriving at the home of his sister, Mrs. Ungefug, in Southern California, he announced he had come to get Beverly from or through Frank Watson and said he would then return to Chicago by way of Las Vegas where he would stop to work in order to complete the trip. For several nights he apparently was engaged in an effort to locate Laberta and the child. Finally on the night of the 15th he left in a taxicab to meet Watson at some place in Arcadia, saying that Frank would take him to Laberta and he would get Beverly and go on to Las Vegas. So far as reasonable inquiries could disclose, he never arrived there. On the same night, in the middle of the night, two Arcadia police officers saw an automobile parked in the grounds of the Monrovia Nursery. Turning their spotlight on it a man and woman appeared, walked over to the police car, Watson gave his name and Laberta said that she was Mrs. Watson (they were not married until November 12, 1955) and "they" said they were

having domestic troubles and Frank had "chased" Mrs. Watson out there in a quarrel but everything was then all right. On February 20, 1960, five years after Freyer's disappearance with no trace of his whereabouts being left, investigation officers searched for his body in the desert near Palm Springs, found a human femur and a fibula which could have belonged to a man of his height and which when compared with X-rays of his own bones could not be ruled out as belonging to him.

We hold that the foregoing evidence amply established that "reasonable probability" of death by criminal means which spells prima facie proof of corpus delicti. (See *People* v. *Ives, supra,* 17 Cal.2d 459, 464 and other cases cited *supra.*)

As soon as the ruling upon prima facie corpus delicti was made, the silences of the prosecution's story flamed into revealing light. In May, June or July of 1955 Mrs. Ungefug asked defendant what happened the night he was supposed to meet Freyer and he said, "Bertha, I didn't meet him"; that he had not seen him and did not know his whereabouts. In the same conversation defendant said he was going to marry Laberta, was going to send her to Nevada to get a divorce. In the evening of February 17, 1960, Dale Green and appellant were sitting in a parked automobile talking; defendant brought up the subject of killing; and as Green related the matter, "Frank asked me if I was in love with his wife, Laberta, and I said, 'No, Frank, I don't believe I am.' And he said, 'Well, do you love her enough to kill a man for her?' I said, 'Frank, I don't love anybody enough to kill anybody for anybody.' He said, 'Well, I do. I killed her second husband.' " On the following Saturday (February 20) Green was interviewed by the police and on that same day Watson was arrested. On his way to the police station he remarked that "this would be another Scott case," doubtless referring to the murder around which revolves the opinion in *People* v. *Scott,* 176 Cal.App.2d 458 [1 Cal.Rptr. 600].

At the police station defendant voluntarily talked to the officers and the conversation was recorded on tape. Before making his statements of fact defendant wanted to talk to his "wife." He was given a note from Laberta which said in part, "we have just got to tell him that we believe he was following me, honey. You know that." When she came into the room a few moments later she said, "But we've all got to have happiness and this—and this is hanging over our head and has been for two months." Again: "WATSON: What will

happen to our daughter? LABERTA: Don't worry. She'll be taken care of.'' In fact, ''our daughter'' is Beverly, the daughter of Freyer.

After assuring the officers that Laberta did not have anything to do with it (the murder) appellant proceeded to tell his story as follows: He met Laberta at a bar and a friend asked him, ''How would you like to have her?'' Soon they were living together. Then Freyer took her to Las Vegas but she went back to appellant in Monrovia. About August 1954 Freyer returned from Chicago to Monrovia, found Laberta, raped her, tore up the house, tore appellant's clothing and when appellant arrived told him to get out; a fight ensued. ''I wasn't scared or anything but I knew at the time how much I hated him for what he did to my wife. I shouldn't say my wife, we weren't married at that time.'' Laberta told defendant that Freyer would kill, and he believed it. Then she left him for a month, at the end of which time he found her in Monterey Park. Meantime he was ''mad'' at her and wanted to see her hurt, so he called Freyer in Chicago and he flew out to California. By the time he arrived appellant was over his ''mad'' and did not want harm to come to Laberta so he persistently misled Freyer as to her whereabouts.

Once defendant had a knife with him and when Freyer's back was turned, tried to kill him, but could not do it. Another time he was armed with a gun and tried to kill Freyer but could not go through with it. When the two of them were at the Monrovia Nursery on the night of February 15-16, Freyer was calling Laberta vile names, had a knife and started toward appellant so ''I shot him. I don't know, I mean I didn't go insane, I am not trying to get out of it and say I was insane. I did go out of my head though, I just—the only thing I wanted to do was—was to get rid of him. I am sorry.'' This killing was done with a foreign made gun, a .32 which defendant had bought. ''I believe it was .32. I don't know. I just kept pulling the darn trigger, that's all I know.'' The shooting was about midnight or later. Appellant then went to Laberta and told her, '' 'You don't have nothing to worry about no more. You will have your freedom now.' So I went back and I made her go back to make sure. I mean, where she wouldn't have no more worries. So we went back . . . I took him—— I put him in the back of the car. About that time the police department came up so I ran, I was scared. But she just stayed there and she said, 'Frank,' she says, 'it is all right. Come on back,' she says, 'Get it over

with.' So I came back." After the police left, "I took the body. I told her, I says I have got to get rid of the body. I says, even though the facts like they were I says I couldn't—— I mean now it's too late that I took the body out to the desert and buried it out there. It was close down to Palm Springs. . . . [Sergeant] HUMAN: Do you think you could find that location at this time? WATSON: I'll try my best for you. HUMAN: You did bury him, is that right? WATSON: Yes, sir. . . . HUMAN: . . . Now, according to what you have told us here, you state that at the time that you shot Mr. Freyer that he had a knife in his hand. WATSON: Yeah, but I don't know.''

About 15 minutes later appellant gave another statement which was taken down in shorthand. It followed closely the one which had been tape recorded but contained some additional items of information such as the following: When he first met Laberta defendant thought she was married to Freyer; the two of them were living together as man and wife in Monrovia at the time Freyer attacked her; that relationship between Laberta and appellant continued unabated except for the month that she left him; it was in February 1955 that appellant telephoned Freyer in Chicago; Laberta said, ''He's going to kill me.'' After appellant had failed to kill Freyer with his knife, as he himself phrased it, ''So I started to try again, so I bought this gun from this guy at work.'' Then he bought ammunition for it and put the gun under the seat of the car. After driving around on the night of the 15-16th, pretending to look for Laberta, appellant pulled into Monrovia Nursery, ''that way no cars would be coming by and ask us what we were doing there.'' Freyer started saying things about Laberta, both got outside the car, appellant taking the gun with him, whereupon he aimed it at Freyer but could not pull the trigger. He said to him, ''I know where she is and I'm in love with her and I'm going to marry her.'' Freyer took his knife out, took one step toward appellant who then shot him; Freyer turned and ran and appellant shot him again; then Freyer swung at him with the knife and appellant shot him again and just kept pulling the trigger. Then he pulled him over behind some small bushes and went to Laberta. On their return to the scene they put the body in the trunk of the car, told the police of the lovers' quarrel and drove to the desert and buried the body. Appellant stole a shovel on the way to the desert and threw the victim's belongings out of the car as he drove along.

All these statements were made freely and voluntarily according to the interviewing officer, Sergeant Human, and by appellant himself. Such evidence makes a competent showing upon the subject. (*People* v. *Nagle*, 25 Cal.2d 216, 225 [153 P.2d 344]; *People* v. *Crooker*, 47 Cal.2d 348, 352 [303 P.2d 753]; *People* v. *Grace*, 166 Cal.App.2d 68, 71-72 [332 P.2d 811].) Counsel's contention that appellant's statements were not made freely and voluntarily cannot be sustained. The question was left to the jury under instructions which are not assailed. The jury found those statements to be free and voluntary and there is in the evidence nothing to warrant our overthrowing this finding. ██ "The attendant circumstances which go to the free and voluntary nature of such statements are preliminary questions for the court and finally questions of fact for the jury under proper instructions (*People* v. *Fox*, 25 Cal.2d 330, 340 [153 P.2d 729].) ██ When the question has been resolved against the defendants, the determination will not be disturbed unless it is without sufficient evidentiary support (*People* v. *Mehaffey*, 32 Cal.2d 535, 554 [197 P.2d 12].)'' (*People* v. *Burwell*, 44 Cal.2d 16, 30 [279 P.2d 744].)

██ The further argument that the prosecution was bound by this evidence of defendant as to how the killing occurred is misplaced, as is shown by this language quoted from *People* v. *Acosta*, 45 Cal.2d 538, 542 [290 P.2d 1]: "[I]f there is prosecution evidence which tends to disprove criminality and other prosecution evidence which tends to prove criminality, it is the function of the trier of fact to determine which version is to be believed. [Citations.] The courts may sometimes say that the prosecution is 'bound by' extrajudicial statements of defendant which are introduced by the prosecution and which are irreconcilable with guilt, but this concept is applicable only where there is no other competent and substantial evidence which could establish guilt. [Citations.]"

Later on the same day (February 20, 1960) appellant went with the officers to locate the body. He indicated on a map the approximate place of burial and directed them to the spot which was near a dirt road leading off the Palm Springs cutoff road. The bones were found within a few feet of the spot indicated by him.

Nine months after Freyer's disappearance appellant and Laberta without any apparent effort to get a divorce for her, entered into a marriage ceremony. From this plainly arises the inference of knowledge of Freyer's death.

When the People rested defendant did likewise. His silence, of course, emphasizes the inferences to be drawn from the prosecution's evidence. (*People* v. *Ashley,* 42 Cal.2d 246, 268-269 [267 P.2d 271].) In our foregoing statements of facts we have adopted the testimony and inferences favorable to respondent as we are obligated to do. (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911].)

An argument of self-defense is advanced but without much indication of confidence. The best that can be said for it is that the jury and trial judge (who denied a motion for a new trial) did not give credence to it.

■■■■■ It is also argued by appellant that prejudicial error was committed in receiving evidence of what Freyer said about his intentions when leaving Chicago on February 11— that he was going to California to get Beverly from or through Frank Watson—that this contained hearsay and was incompetent. Not so. In the first place the evidence was received without objection and it is too late to raise the point. (*People* v. *Brown,* 145 Cal.App.2d 778, 782 [303 P.2d 68].) On the merits it should be recognized that the frame of mind of a missing person is an important factor in determining whether his disappearance was voluntary or brought about by some criminal agency. This man's absence of motive for disappearance was material to the problem, what he knew or thought he knew and what he intended to do were important items of evidence bearing upon the intervention of a criminal agency as the cause of his unexplained and extended absence.

■■■■■ *People* v. *Alcalde,* 24 Cal.2d 177 [148 P.2d 627], at page 185: "From the declared intent to do a particular thing an inference that the thing was done may fairly be drawn. Such declarations have been deemed admissible where they possessed a high degree of trustworthiness. Where they are relevant to an issue in the case and the declarant is dead or otherwise unavailable the necessity for their admission has been recognized. *Mutual Life Insurance Co.* v. *Hillmon,* 145 U.S. 285 [12 S.Ct. 909, 36 L.Ed. 706], appears to be the leading case on the admissibility of declarations of intent to do an act as proof that the act thereafter was accomplished. The courts of this state have followed what is deemed to be the weight of authority (see Wigmore, Evidence, 2d ed. 1923, § 1725; 19 Cal. L. Rev. 231 and 367; 35 Harv. L. Rev. 302, 444) to the effect that declarations of present intent are admissible to prove a future act." At page 187: "The declaration of the decedent made on November 22d that she was going out

with Frank that evening stated a present intention to do an act in the future. Certainly it was a natural utterance made under circumstances which could create no suspicion of untruth in the statement of her intent.'' At page 188: ''Unquestionably the deceased's statement of her intent and the logical inference to be drawn therefrom, namely, that she was with the defendant that night, were relevant to the issue of the guilt of the defendant.'' *Benjamin* v. *District Grand Lodge No. 4,* 171 Cal. 260 [152 P. 731] states at page 267: ''Any facts or circumstances relating to the character, habits, condition, state of mind or any of those things which usually control the conduct of a man are competent evidence from which may be inferred the death of one absent and not heard from, whatever may have been the duration of his absence. (*Tisdale* v. *Connecticut Mutual Life Ins. Co.,* 26 Iowa 176 [96 Am. Dec. 136].) Acts tending to show Mr. Benjamin's state of mind at or about the time of his disappearance were proper for consideration as indicating the probability of his having committed suicide according to the declarations in his letter.'' (See also to the same effect *People* v. *Brust,* 47 Cal.2d 776, 784-785 [306 P.2d 480]; *People* v. *Weatherford,* 27 Cal.2d 401, 421-422 [164 P.2d 753]; *People* v. *Hamilton,* 55 Cal.2d 881, 895 [13 Cal.Rptr. 649, 362 P.2d 473]; *People* v. *Chenault,* 74 Cal.App.2d 487, 495-496 [169 P.2d 29].)

We entertain no doubt that the evidence is sufficient to sustain the verdict of premeditated murder of Freyer by appellant and that none of appellant's assignments of prejudicial error is well taken.

The judgment is affirmed.

Fox, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 21, 1962.