[Crim. No. 14400.    Second Dist., Div. Five.    Apr. 10, 1969.]

THE  PEOPLE,  Plaintiff  and  Respondent,  v.  LLOYD
EDWARD LIVINGSTON, Defendant and Appellant.

Lloyd C. Griffith for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Robert P. Samoian, Deputy Attorney General, for Plaintiff and Respondent.

AISO, J. — Defendant Lloyd Edward Livingston was charged by information with the crime of murder (Pen. Code, § 187 violation). After a trial to the court sitting without a jury, defendant was found guilty of voluntary manslaughter (Pen. Code, § 192, subd. 1 violation), a lesser but necessarily included offense. Probation was denied. Defendant was sentenced to the state prison. He appeals from the judgment and sentence. (Pen. Code, § 1237.)

Defendant contends that the trial court erred: (1) in admitting hearsay statements of the victim uttered several hours before the shooting, and (2) in finding defendant guilty of voluntary manslaughter on insufficient evidence. He elaborates on the second assignment of error: (a) the finding was a ''compromise verdict,'' and (b) the circumstantial evidence is ''just as suggestive of innocence as it is of guilt.''

We conclude that the judgment and sentence should be affirmed.

I.

In view of the challenge to the sufficiency of the evidence, we set it forth at some length. The narration is necessarily extended because much of it is circumstantial. The evidence is viewed in the light most favorable to the People. (*People* v. *Teale* (1969) 70 Cal.2d 497, 502 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Combes* (1961) 56 Cal.2d 135, 139 [14 Cal.Rptr. 4, 363 P.2d 4].)

Defendant, Lloyd Edward Livingston, and the victim, Bernice Thomas (''Bernice''), were not married, but had been living in a common law marital relationship for about one-and-a-half years. On May 6 and 7, 1967, they were residing, together with Bernice's brother, Freddy Lee Lane (''Lane''), at 1046 West 92d Street, Los Angeles. Defendant was a 36- or 37-year-old cement mason. He had not worked the week

preceding May 6, 1967. Bernice was a 36-year-old domestic worker. She was right-handed.[1]

On Saturday morning, May 6, 1967, the defendant, Bernice, Lane, and Mrs. Tommie Jewel Chatterfield ("Tommie") went to Tommie's home at 5113 Long Beach Avenue, Los Angeles. Tommie was Bernice's aunt. A card game for money was started around 11 a.m. and lasted until approximately 2 or 2:30 a.m., the following morning, Sunday, May 7, 1967. The people gathered were mostly relatives and a few friends. Once during the day on Saturday, defendant went out to a liquor store. He returned and drank beer and vodka during his stay at Tommie's.

Defendant had an argument with a Mrs. Cleo Chatterfield ("Cleo"), another of Bernice's aunts, during the early evening hours on Saturday night. Cleo had "stopped [defendant's] bank for $19" and started an argument. Defendant claimed that he had beaten her at Twenty-one and Blackjack and that she refused to pay. He asked Bernice to take him home. It was around 8 or 8:30 p.m. Defendant was angry when he left. Defendant and Bernice arrived home around 9 p.m. Bernice went inside with the defendant, but left alone five or ten minutes thereafter. She told the defendant, "she got to go back and make money I [defendant] lost." Defendant had lost $19 or $20 on Friday and a similar sum on Saturday. Bernice arrived back at Tommie's, alone, around 10 p.m., which was about an hour after she had left earlier with the defendant.

Before Bernice had returned, defendant had called a Mrs. Mary Louise Webb, who resided upstairs from Tommie's apartment. He said on the telephone, "This is Lloyd. Would you go down and tell Bernice to call me." Mrs. Webb went downstairs and relayed the message to an Annie McGruder ("Annie"), still another of Bernice's aunts.

Cleo testified that she answered the phone at Tommie's about thirty minutes after defendant and Bernice had left. Bernice had not yet returned. Defendant was on the phone and sounded angry. When she informed him that Bernice was not back, he said, "Tell her, God damn it, to call me the minute she gets there and I'll be waiting for her." When Bernice returned about thirty minutes after this phone call, Cleo gave her the message.

Earline James testified: She was at Tommie's from around

---

[1]This is important as defendant testified that she was holding the gun used in the killing in her left hand.

11 a.m. or 12 noon, Saturday, until around 2:30 a.m., Sunday. She was aware of defendant and Bernice having left around 7:30 or 8 p.m. and that Bernice had returned later. When Bernice returned, she did not appear angry, but she did appear nervous. About that time, someone asked Bernice about the defendant. Over the defendant's objection, the witness was permitted to reply that Bernice said, "He was arguing and talking about shooting me and stuff." Bernice also requested, "Would you pull the shades down and lock the door, and if anybody knocks, ask who it is before you open the door." When the witness was taking her leave around 2:30 a.m., Bernice was doing likewise. At that time, Cleo asked Bernice, "why didn't she spend the night down here. [¶] She said, 'No, I'm going home. Lloyd was mad; he's probably forgotten he's even mad at me now. I'm going home."

Bernice left Tommie's around 3 a.m. She dropped Annie off at her home at 725 East Adams near Adams and San Pedro. At the time she let Annie off, she did not appear to be angry.

Mary Elizabeth Storie testified: She resided at 1050 West 92d Street, Los Angeles, on Saturday, May 6, 1967, but around 11 p.m. that evening she was visiting at 1056¾ West 92d Street. About that time, defendant who "had been drinking quite a bit" came to 1056¾ and asked that he be taken to a party on Long Beach Boulevard. When no one would take him, defendant left after staying about ten minutes. Later when the witness passed 1046 West 92d Street around 1-1:30 a.m. en route to Kites Restaurant on 92d and Vermont, she saw defendant sitting on the porch. He was dressed. She purchased some food to take-out at the restaurant and returned with it to 1056¾ West 92d Street. She did not see defendant when she passed 1046 on her return trip. Later when she was returning to her own home from 1056¾, around 2:30 a.m., defendant was again on the porch. He was dressed.

Richard F. Pachal, a deputy sheriff assigned to the Lennox Patrol Division on May 7, 1967, went to 1046 West 92d Street in response to a radio call to his vehicle. He arrived there about 3:30 a.m., accompanied by his partner, Deputy Robert McPherson.

As he arrived, he saw the defendant on the front porch, attired only in a white undershirt and white undershorts. He was excited and yelling, "Get an ambulance; she's been shot; don't let her die."

Deputy Pachal entered the house, walked through the living room and dining room, and glanced towards the bedroom. As he was walking through the dining room he saw a woman "laying [sic] on her back at the end of a small service-porch-type entrance at the very rear of the house." On examining her, he "observed a lack of breathing, a lack of pulse, what appeared to be a bullet hole in the center portion of the chest, the eye pupil did not react to light. The eyeball had lost its glisten, and had turned dullish. The eyelid showed no reaction or reflexes to [his] lifting it with [his] finger and releasing it." There was no sign of life whatsoever. Defendant identified her as Bernice Thomas.

Deputy Pachal also saw a small caliber revolver, nickel or chrome-plated lying 12 or 14 feet north of the body and in direct line with it. He identified the weapon marked Exhibit 7. (The weapon was a 2-inch Liberty 21 chrome painted .22 caliber short revolver with brown plastic grips, serial number 10446, manufactured in Germany.) He picked up the weapon and examined it for his own protection. He ascertained that it had two unspent "rounds" and four spent shells in it. The weapon was later taken by Sergeant Collins of the sheriff's homicide detail.

Deputy Pachal checked the rest of the premises. The lights were on in all the other rooms. Defendant had followed him in. No one else was inside the house. After a lapse of five to seven minutes, Lane came in through the front door. Lane was wearing a red pullover short-sleeved sweater, a pair of black pants, and black socks. He had no shoes on.

Deputy Pachal ascertained that defendant and Bernice had occupied the bedroom in the northwestern portion of the house. Clothing was strewn around in the room. "The bed was a mess, as if someone had been sleeping in it, thrown the covers back." He observed what appeared to be two bullet holes in that bedroom. One was in the north wall, around the center of bed, about 3½ feet above the headboard. The other was a hole through a closet door on the north wall at the west corner of the room. The closet extended northward from the northerly wall. This hole was about 5½ feet from the floor.

Deputy Pachal saw another bedroom, in which he observed a plate lying on a bed with what appeared to be scrambled eggs, two slices of toasted bread, and a fork resting on top of the eggs.

Dr. Thomas T. Noguchi, a coroner's pathologist, testified that death was caused by a gunshot wound of the chest pene-

trating the heart, aorta, and left lung with massive hemorrhage. The "entrance wound" was on the center of the chest, mid-portion of the sternum, on the level of the third-rib cage. The wound penetrated from front to back, right to left, penetrating the pericardium and the heart, and the descending portion of the thoracic aorta downward to the seventh thoracic vertebra area. He recovered a bullet from the left side of the back at the level of the eighth intercostal space.

He also found a piece of lead, about one-eighth inch in size, which had partly penetrated Bernice's left arm. The bullet fired into the sternum had not shaved or split up. The small lead fragment was not, in his opinion, part of the bullet which entered the sternum.

He testified that if a right-handed person held the gun (Exhibit 7) in his left hand, in the manner described by the defendant, in alignment with the wound track he found in Bernice, it would be difficult to pull its trigger.

He found no traces of blood alcohol in Bernice. He did find some powder burns on her clothing and some embedded at the top of the "entrance wound." He opined that the gun had been held from 2-or-3 to 6-or-7 inches from the wound when it was fired. The traces of gunpowder on the clothing measured $1\frac{1}{2}$ inches in diameter, with black powder around the area.

Robert P. Christiansen, a deputy sheriff and a ballistics expert, testified: He had test fired Exhibit 7. In his opinion, the bullet recovered from the deceased's body was fired by Exhibit 7. He examined the shells, two live rounds and four expended, and found the prime impressions on all bearing the same characteristics produced by Exhibit 7. On that basis, he opined that the four expended ones had been fired from the revolver, and that the two live rounds had been attempted to be fired, but had misfired.

He found nothing on the piece of lead one-eighth inch in size which would indicate that it had come from the bullet found in the body. He doubted that if one had held the revolver in her left hand and fired it, a piece one-eighth inch in size would have sheared off. To shear off a piece that size, the bullet would have had to hit something hard. It would be doubtful that a gun held in the left hand and pointed away from the body would cause a piece to fly back into the inside upper portion of the left arm. On the other hand, a bullet going through a wooden door could have a fragment one-eighth inch in size shear off.

Algy F. Landry, a sheriff's detective sergeant, testified that

defendant was still under the influence of alcohol around 6 a.m., Sunday morning.

## II.

Lane testified:[2] He left his Aunt Tommie's place after Bernice did. It was around 2:55 a.m. or 3 a.m. He took his Aunt Cleo's son to his aunt's home, which was located at 55th and Morgan; stayed there about ten minutes; and then went to his own home. It took about 20 minutes over-all to get from Tommie's to his home. As he entered his home, he saw his sister, Bernice, who was then fully dressed. He went to his own bedroom, pulled off his shoes, and returned to the kitchen and fixed himself some bacon and scrambled eggs and bread. He took the food to his bedroom. He later saw defendant and Bernice go to their bedroom. He turned out the kitchen light and went back to his room. As he did so, he heard defendant yell, "Get to getting." Then he heard the sound of two shots coming from the direction of defendant's bedroom. He proceeded to the kitchen-living room area. Bernice, dressed in a blue nightgown, ran past him. Defendant came through the bedroom door, turned toward the living room door. He was in back of Bernice. Bernice's hands were bare, but defendant had a .22 caliber pistol (Exhibit 7) in his right hand. Defendant then turned back towards the kitchen, still clutching the gun in his hand. Bernice had stopped in front of the deep freeze. He did not see any struggle between Bernice and defendant. He ran out the back door. Another shot went off just as he reached the back door. He heard still another shot when he was outside. He was frightened and remained outside hiding until he saw the deputy sheriffs arrive. He followed them back into the house. The gun belonged to Bernice.

Lane later admitted that on the 7th of May when he was questioned by the officers, he had not told them that he was inside the house when the shooting occurred. He had told them that he was outside as he had left the house to go buy some beverage. He gave as his reason for lying to the officers that he was frightened at the time.

## III.

The defendant testified on his own behalf. He admitted he had called the lady (Mrs. Mary Louise Webb), who lived

---

[2]Only that portion of Lane's testimony which supplements or conflicts with the evidence heretofore narrated will be given. A similar pattern will be followed in setting forth the defendant's testimony.

above Tommie's place about 9 or 9:30 p.m.—about a half hour after Bernice had left. His purpose was to have Bernice assist him in finding his "union book." Bernice had had it. Without it, he could not get a new job. He waited for Bernice to return the call, but when she did not, he went to bed around 10 or 10:30 p.m. He got up around 11:30 p.m.; Bernice still had not returned home. He then went next door, "talked to the white lady," and asked her to take him over to Long Beach, because he was uneasy as to whether anything had happened to Bernice. Since no one would take him to "Long Beach," he returned home and got back into bed. He arose again around 2:15 or 2:30 a.m., put on his clothes, and went out on the porch for 10 or 15 minutes. He then again returned to bed.

The next thing he knew, he was awakened by Bernice. "She had the gun at me." Identifying Exhibit 7 as the gun, he indicated that Bernice was holding it in her *left* hand. When he first saw the gun, he was lying on the easterly side of the bed. Bernice was standing on the westerly side towards the foot of the bed. She said, "Who is that bitch you have been fooling around with?" (On May 7, 1967, he had stated to the sheriffs: "She told me, 'You've got a heap of sense, who is that bitch you have been fooling around with?' [ ¶ ] And I says, 'What do you mean?' [ ¶ ] At that time she had the gun and I started to take it from her.") He jumped up to take the gun away; it went off; it was still in Bernice's hand. He indicated that he had obtained hold of Bernice's wrist area. Then they tussled for the gun, "tussled to the dining room, . . . the gun went off again and she said, 'I'm shot,' and the gun fell out of her hand inside of the kitchen. . . ." She was 8 to 10 inches from the defendant when the gun went off.

As Bernice staggered backwards and fell, defendant jumped around her and said, "Honey, don't die, what is wrong with you?" He saw blood coming up. He tried to call the police, but couldn't complete the call. So he ran outside and "started hollering for help." He was outside when the two "police officers" came up.

To his knowledge, Lane was not in the house when the shooting occurred. He actually didn't know who all were in the house when Bernice awakened him.

The revolver was one that he had bought for Bernice, she

was the owner of it,[3] and he did not know where she kept it. He did not intend to shoot Bernice.[4]

Defendant had not been playing around with any other women. Bernice was jealous, because ''[a]nyone is jealous of their [sic] husband.'' On cross-examination, he demonstrated how Bernice was holding the gun and the manner in which he tussled for the weapon. (No description of that demonstration is in the record before us.)

Defendant denied that he had telephoned Tommie's house after Bernice had left to go back Saturday night or that he had talked to Cleo on the telephone. He didn't know Tommie's phone number.

He denied saying anything like, ''Get to getting'' about the time he was tussling for the gun. He did not chase Bernice. He did not ever obtain complete possession of the gun.

## IV.

The statements which Bernice made upon her return to Tommie's house, after taking defendant home around 8 p.m., Saturday evening, and to which the witness Earline James was permitted to testify, were admissible to show Bernice's state of mind. Defendant had claimed that she was the aggressor and that the gun went off accidentally while defendant was trying to wrest it from her. The state of Bernice's mind was therefore an issue which was circumstantially relevant; her death had made the use of such evidence necessary. The evidence was, therefore, admissible. (Evid. Code, § 1250; *People* v. *Lew* (1968) 68 Cal.2d 774, 782 [69 Cal.Rptr. 102, 441 P.2d 942]; *People* v. *Ireland* (1969) 70 Cal.2d 522, 530-531 [75 Cal.Rptr. 188, 450 P.2d 580]; *People* v. *Atchley* (1959) 53 Cal.2d 160, 172 [346 P.2d 764]; *People* v. *Finch* (1963) 213 Cal.App.2d 752, 765 [29 Cal.Rptr. 420].) There is nothing in the record which would indicate that Bernice was not telling the truth. The witness, James, had testified that when Bernice returned, she did not appear angry but that she did appear nervous. Bernice evidently harbored no anger towards defendant. When asked by her Aunt Cleo why she shouldn't spend the night at Tommie's, Bernice

[3]It was stipulated that if a Sol Cohen were called by the defense and sworn as a witness, he would testify: He is an employee of Bob's Loan Company, 4400 South Vermont Avenue, that Bernice Thomas purchased the gun (Exhibit 7) on May 21, 1966, at which time it was registered in her name.

[4]''Q. Did you intend to shoot? A. How was that? Q. Did you intend to shoot her? A. Shoot her? Q. Yes. A. No; what would I kill my wife for?''

replied, "No, I'm going home. Lloyd was mad; he's probably forgotten he's even mad at me now. I'm going home."

The trial here was to a judge sitting without a jury and he indicated for the record that the statements were being received solely as nonhearsay evidence of the deceased's state of mind, and not for the purpose of "showing the state of mind or any actions on the part of the defendant." We, therefore, are not confronted with situations presented in such cases as *People* v. *Hamilton* (1961) 55 Cal.2d 881, 895 [13 Cal.Rptr. 649, 362 P.2d 473] or *People* v. *Ireland* (1969) *supra,* 70 Cal.2d 522, 531. We hold there was no error in the admission of these statements made by the deceased.

## V.

■ The evidence is sufficient to sustain the finding of voluntary manslaughter.

(a) The trial court remarked that if Lane had not been impeached, there would be no difficulty in finding defendant guilty of murder of the second degree. But since Lane was impeached, the court stated that it was giving defendant the benefit of the doubt and finding him guilty of the lesser offense of voluntary manslaughter. Lenity on part of the trier of the fact, especially where it is a judge of long experience in criminal law, does not mean ipso facto that the result reached was a compromise. The circumstantial evidence discredited a great deal of defendant's testimony. The trial court had the benefit of the reenactments of the shooting by the defendant and other witnesses, which are not recorded by word descriptions in the record before us.

(b) ■ We do not agree that the circumstantial evidence is just as consistent with innocence as it is with guilt in this case.

Even if the evidence in the cold record did not favor the prosecution's theory, the rule which the defendant has in mind, in tenor similar to CALJIC 26 Revised, is one for the trial court to apply and not for an appellate court in review. (*People* v. *Teale* (1969) *supra,* 70 Cal.2d 497, 505; *People* v. *Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Daugherty* (1953) 40 Cal.2d 876, 885-886 [256 P.2d 911]; *People* v. *Newland.* (1940) 15 Cal.2d 678, 681-682 [104 P.2d 778]; *People* v. *Treggs* (1959) 171 Cal.App.2d 537, 543-544 [341 P.2d 342].) ■ The trial court could have found in this case that the circumstantial evidence was incompatible with defendant's theory that the shooting was

excusable and that from a consideration of all of the evidence an unlawful homicide had been committed in the heat of defendant's anger. (*People* v. *Acosta* (1955) 45 Cal.2d 538, 541-542 [290 P.2d 1]; *People* v. *Collins* (1961) 189 Cal.App. 2d 575, 591 [11 Cal.Rptr. 504].)

## VI.

The judgment and sentence is affirmed.

Stephens, Acting P. J., and Reppy, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 25, 1969.