[Crim. No. 14681. Second Dist., Div. Two. June 3, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. LOUIS SCHINDLER, Defendant and Appellant.

Jerome Weber and Bernard Mattison for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

RÓTH, P. J.—Appellant, charged with first degree murder of his wife, was convicted of second. He appeals from the judgment of conviction.

On April 9, 1967, the day of the murder, appellant was

approximately 45 years of age. Appellant and June Schindler, his second wife, the victim, were married in December 1963. In May of 1964 they separated, but reconciled in November or December of 1964. In April 1966, a daughter was born to them. For some weeks prior to the fatal shooting, appellant and June were in the process of getting a divorce. Each continued to occupy separate bedrooms in the marital residence on Mulholland Drive in Los Angeles.

In October 1966 and for some days in January and February of 1967, appellant hired a private detective to follow June.

On the evening of April 9, 1967, June expected Ceil Ross and other friends for a "pot luck" dinner. Ceil Ross had known June Schindler for approximately 13 years. Ceil arrived first. Mona Fleeman arrived later with her daughter and a girl friend. June had prepared chicken. The guests contributed other food to the meal.

At about 8:30 p.m., appellant appeared at the marital residence with his friend Bill Teige. There were pieces of chicken in a platter on the breakfast bar, which separated the kitchen from the family room. Appellant invited Teige to join him in eating the chicken. June protested, "It is not yours; the girls brought dinner." Appellant and June exchanged words for about five minutes. Appellant and Teige ate the chicken and went into the family room. Soon thereafter they left.

Shortly after 9 p.m. Mona Fleeman and the two girls left. Ceil stayed for about an hour and, among other things, commented that it must be difficult for June to live with appellant in the house. June answered, "Yes. However, I have discussed it with my attorney and he said I could not get Lou out of the house unless he were to hit me, which he's not going to do."

About 10 p.m., Inger Hakansson, a 19-year-old girl recently arrived from Sweden, employed as a maid in the Schindler home, having had the day off, returned to the house.

Appellant returned at approximately 10:45 p.m. He came through the family room and back porch, looked into Inger's room and observed Inger and June in conversation. The women ignored him and continued their conversation. He went away. Within a few minutes appellant returned. He was angry. He argued with June about the continued employment of Inger in Inger's presence. June left the room. Appellant left with her. Almost concurrently Inger heard June making a phone call from the family room. The telephone was normally

kept against the wall on the bar and Inger had seen it there when she had returned home. She heard June say, "Hi, Ceil. The big mouth is home now."

Ceil confirmed that she received a phone call from June at about 11 p.m. June said, "I had to call you and give you a big laugh. The big mouth just walked in and told me that he met you outside the house and that you told him that I was in love with another man." June's tone of voice was sarcastic. As Ceil was about to reply she heard what sounded like the phone falling to the floor and sounds like the crack of chairs falling down; a great deal of screaming and the dog barking very loudly. She heard June say, "Help! I need help!" Ceil listened for a few seconds longer but heard nothing. She hung up immediately, tried successively to reach June's number but heard only a busy signal. Ceil contacted the operator and called the police.

Inger testified that about four minutes after the Schindlers had left her room she heard a noise like the dog leash hitting something. It was a sharp metal sound. She heard the sound two or three, perhaps four times. Inger ran out of her room and stood in the doorway between the back porch and the kitchen. She looked through the kitchen into the family room and saw appellant standing by the entrance to the family room from the kitchen area, with a gun in his hand, two meters away from June. He was pointing the gun at June who was standing by the dining table. The telephone was on the floor near the dining table but closer to the breakfast bar. June "appeared to be really upset; her hair was all mixed up." Inger stood there for 30 seconds, she heard no words exchanged and ran back to her room and closed the door. After that she heard one or more sounds such as she heard before and then recognized them as gunshots. She did not see appellant again. Subsequently she met June in the back porch.

It is not disputed that Inger came out of her room and met June in the back porch. June had blood all over her and was in a disheveled condition. June told Inger to run to the nearby fire station for help. Inger helped June outside to the street and ran to the station. June walked down the street in the other direction. (June was found later lying face down in a planter bed, a short distance from the marital domicile. She was dead before the ambulance arrived.) Inger ran up the driveway to the fire station and found the captain. The police department and an ambulance were called. Inger later

returned to the house and showed officers who subsequently arrived, various parts of the house.

The secretary to the attorney who represented the victim in the divorce action against appellant, testified in rebuttal to a telephone conversation with the victim on April 5, 1967. The victim, she said, told her that a gun which was customarily kept in the closet, was missing, and that she was afraid that appellant was going to kill her. This testimony was admitted for the sole purpose of showing the victim's state of mind.

Decedent's mother testified that in June of 1964 during a period of the Schindler's separation, appellant told her, "If I can't have her [June] I'll fix it so no one else can."

Decedent's brother testified that on December 25, 1966, during a family gathering at the Schindler home, he overheard appellant on the telephone, saying "One of these days, I'm going to shoot June and the baby and her whole damned family," and after a pause of about five seconds, appellant added, "Oh, yes, I can get away with it." The brother never told his sister nor anyone else about having overheard this telephone conversation.

## APPELLANT'S TESTIMONY

Appellant was and had been continuously in the carpet business as a mill representative. He had been previously married. There were two children of said marriage. There had been a separation in the prior marriage, preceding the divorce, and a reconciliation, which lasted three and one half years. During the period of his prior marriage, he had consulted a psychiatrist, Dr. Sidney Hulbert, on numerous occasions.

Following the termination of his first marriage, he met June Schindler in 1962 and married her in 1963. Shortly after his marriage to June, he constructed the family residence. After six months of marriage, there was a separation, but a reconciliation was effected in 1964. Following the reconciliation, a child was born to the couple on April 22, 1966. He owned a .32 caliber pistol, purchased in 1956 or 1957. At the time of the purchase he was travelling and frequently carried large sums of money. After his marriage to June, the gun was kept in the nightstand on his side of the bed in the master bedroom. The gun was loaded with six shells in the clip and one shell in the chamber; there was no other ammunition for the gun and it was the only gun he ever owned. He showed his wife on at least two occasions how to use the gun. On one

occasion he saw the baby crawl on the floor and open the drawer where the gun was kept, whereupon he removed the gun from the nightstand to a shelf in the closet located between the powder room and the living room. He had seen the gun there about a week or two before the homicide.

In early February 1967, June told him she wanted a divorce. He told her he did not want a divorce and suggested marriage counseling. The suggestion was ignored and he learned that the divorce action had already been filed five or six days previously. June asked him to leave the marital residence on a number of occasions. He told her he did not want to leave either her or his baby, that there was no necessity for him to do so, and that, if he could remain in the house, there was a prospect of saving the marriage. During the next five weeks, June, on a number of occasions, repeated her demand that he leave.

During the week prior to April 9, he purchased a microphone and installed it in June's bedroom, because he wanted to know if he could hear anything which would indicate whether or not there was a chance to save the marriage. On Saturday morning, April 8, he heard June say to someone that he had stolen the laundry and he heard June say to his friend Bill Teige ''I hope he drowns and winds up at the bottom with his boat.''

On Sunday morning, April 9, he went to his brother's office to study for a navigational course he was taking; made some phone calls to see if any friends would go sailing with him and went to the California Yacht Club and spoke to a man about membership in the yacht club.

He returned home at about 5:30 p.m., noticed that arrangements were being made to receive company and saw Mrs. Ross and Mrs. Fleeman arrive with her daughter and another teenager. He greeted them and left the house. Between approximately 6 and 9 p.m., he and Bill Teige went bowling and returned to the family residence at approximately 9 p.m. He saw the same people he had greeted earlier in the evening. He and Bill Teige went into the living room, had a drink and saw chicken in a plate on the counter separating the kitchen from the family room. His wife grabbed his arm when he started to take some chicken, saying that he could not eat the chicken, that it was brought by one of her guests. He asked his wife not to get physical. He and Bill Teige each ate some chicken and then left the house.

Leaving the house in Bill Teige's car, he turned on the FM

radio on the frequency of the transmitter he had installed in his wife's bedroom. He heard his wife and Ceil Ross discussing men. He also heard conversation about other men both women had gone with. He heard the name "Lee" mentioned, and assumed that the "Lee" referred to was Lee Fury, the former husband of a mutual friend of his wife and himself who lived close by. The conversation he had overheard made him despondent. He and Teige went to Mrs. Fury's house which was close by. He related to Mrs. Fury he had overheard some conversation, a portion of which had to do with "Lee." Mrs. Fury said she doubted that the "Lee" referred to was her former husband. It was now about 10:30. He was very dejected, he left Mrs. Fury's home and returned to the marital residence. Arriving there, he saw his wife and the maid talking in the maid's room. He proceeded to his wife's bedroom, removed the transmitter and put it under the covers of his bed. He went to the kitchen to get a glass of milk. He heard June and Inger talking about how they were going to get him out of the house. He went to the open doorway of the maid's room and told Inger he was giving her notice to leave. Inger told him to get out of her room. He protested it was not her room, it was his house. A quarrel then ensued between him and June and she ordered him to "get out of here. We're getting you kicked out of this house tonight." He backed out of the maid's room, and started to walk out of the service porch into the kitchen. June was at his heels, shouting and yelling at him. He walked into the powder room and shut the door in her face. He washed his face and hands and went out of the powder room to get a towel because the only towels in the powder room were monogrammed and neither he nor June used them. He went to get a towel under the kitchen sink.

After drying himself he replaced the towel, turned to leave and saw June sitting at the counter with the phone in her left hand and the gun in her right hand. The gun was pointed at him. He lunged for the gun, twisted her hand and banged it on the counter. He recalls hearing some shots go off. The dog was barking and there were noises. He remembered nothing thereafter, until he was about one and one-half miles from the house.

In pertinent part, appellant also testified:

"I was standing at a dead end near a split rail fence holding a child's bicycle in my hand. I don't know how I got there; I don't know where I was. I thought I was dreaming at first, and I thought it was at Bear Mountain State Park,

and there was a stream there, a split rail fence, and I was wet, I was cold. I thought that I wasn't at Bear Mountain State Park. I thought then that I was in Laurel Canyon area. I vacillated between thinking one way and thinking the other. I was like waking up from a nightmare, and I just didn't know whether it was real or unreal for at least the first number of seconds. I tried to collect myself. I saw lights in houses nearby. My legs were cramping. My legs were hurting me, and I saw these lights in the houses, and it reenforced the thought that it was a dream and that I was in the Laurel Canyon area. I dropped the bicycle, I climbed the fence, and went through the yard or lot, whatever it was, and I was frightened. I went to get to a phone booth.

"I remembered June and I fighting and struggling for the gun, and I remembered the sounds. I remembered shots, the dog barking, and furniture being knocked around. I don't have any recollection beyond that. . . .

"The lower portion of my trousers, my socks, my shoes, my shirt was wet. I had no sweater or coat or anything with me. . . . I went to Ventura Boulevard, and there was a Richfield gas station there. I phoned the house, There was a busy signal. I then phoned my brother. [Sam]. . . ."

Sam told him to call his lawyer.

Appellant then detailed how he contacted his lawyer and was surrendered to the police. He denied any conscious memory of ever having any intention to kill June by any physical act on his part at any time. When he saw his wife with the gun in her hand, he was afraid, but had no clear thoughts. His reaction was instinctive. He remembered lunging for the gun, but did not remember grabbing the gun, or taking it away from June, or shooting her. He remembered shots being fired but he did not remember who fired them. He did not remember if the gun was ever in his hand. He remembered twisting June about and hitting her, and that she raised her right hand up in the air and that he slammed it down, and he heard shots fired. He did not remember leaving the house and did not know how he got to the bottom of Laurel Canyon.

Appellant called as witnesses Bill Teige, his brother, his sister and others who corroborated and fortified various facets of his testimony exclusive of the actual shooting and the quarrel which preceded it.

### PSYCHIATRIC TESTIMONY

Dr. Sidney Hulbert, psychiatrist, said appellant had been a

patient of his since December 1955 and that between December 1955 and January 1956, defendant visited him on nine separate occasions. Between November 1956 and October 1957 on seven different occasions. From February 1960 to October 1963 on 22 separate occasions, and from April 1964 to December 1964 on 23 separate occasions; a total of 61 visits between December 1955 and April 1967. From April 15, 1967 through October 11, 1967, he saw appellant on 49 separate occasions.

Dr. Hulbert concluded after the first two series of visits that appellant was mentally ill and was a paranoid personality. The third and fourth series of visits resulted in the same diagnosis.

Commencing April 15, 1967, appellant was released on bail and commenced his last series of visits with Dr. Hulbert.

In the doctor's opinion, appellant, at the time of the shooting had an acute psychotic reaction and a temporary break from reality, and this occurred by his having an acute dissociative disturbance. "By dissociation, I mean that he acted at some unconscious—group of unconscious thoughts, and these unconscious thoughts controlled his behavior so that he was unaware of what he was doing at the time. He did the shooting, actually, while he was completely unaware of what he was doing."

Dr. Alvin E. Davis, a psychiatrist called for appellant, testified he had examined appellant on five separate occasions for a total of approximately six and one half hours after April 15, 1967. He had examined a summary of Dr. Hulbert's treatment experience with appellant and had read appellant's direct testimony. He said that he had sent appellant to a clinical psychologist for "corroboration or difference" with his diagnostic impression of appellant, since he had made a diagnosis of appellant's condition before sending him to the clinical psychologist, and that the tests made by the psychologist almost exactly corroborated his own diagnostic impression.

Dr. Davis was of the opinion that appellant suffered from a disorder he would call "of the type called paranoid personality disorder," that "shortly after he saw the gun, and that was at the moment . . . in which he described he grabbed his wife's wrist, the wrist that had the gun in it, and deflected it, and heard noises, which he said sounded like a shot or two, and from that moment had no memory until he was either getting off of or laying down a child's bicycle. Dr. Davis stated his belief that defendant was in a dissociated state, a psychotic state of mind.

Dr. Von Hagen, called by the People in rebuttal, testified: It was his opinion that if the statements of appellant were true, about the loss of memory, then he had what is called a dissociative reaction. According to this doctor there was no point at which it could be said that this dissociated reaction developed; that it was most likely that the dissociative reaction developed after the shooting when he appreciated the seriousness of the offense.

In his opinion, appellant had the mental capacity to premeditate and the ability to harbor malice prior to the dissociation at the time of the shooting.

 Appellant urges many separate grounds for reversal. We address ourselves first to the one error which we consider prejudicial.

It is clear from the recital of the record that the primary thrust of the defense was that, although June was killed as a result of appellant's act, that there was no malice aforethought, and that at the time of the actual shooting appellant was suffering from diminished capacity. Instructions were requested by the prosecution and given by the court on second degree felony murder. Included in said definition was the final paragraph of CALJIC 305:

"When the killing is a direct result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, such as assault with a deadly weapon."

In an instruction immediately following, the court defined an assault with a deadly weapon.

*People* v. *Ireland,* 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580], holds that the effect of the instruction on felony murder may "eviscerate the entire defense" and holds that the giving of such an instruction is prejudicial.

The language of the court in *Ireland,* at page 538, is apposite.

"Defendant also contends that it was error, in the circumstances of this case, to instruct the jury on second degree felony murder. In the alternative he contends that, if second degree felony murder instructions were appropriate in this case, the court should have given an instruction requested by him which purported to cure any confusion which might result from the giving of such instructions. Because we agree with the former of these contentions we need not address ourselves to the latter."

Precisely as was done at bench the trial court in *Ireland* gave a 305 CALJIC instruction. The court in *Ireland* says, at pages 538-539:

"The jury in this case was given an instruction based upon CALJIC No. 305 (Revised). The instruction given provided in relevant part: '. . . the unlawful killing of a human being with malice aforethought is murder of the second degree in any of the following cases: . . . Three, when the killing is a direct causal result of the perpetration or attempt to perpetrate a felony inherently dangerous to human life, such as an assault with a deadly weapon.' The court then went on to instruct upon the elements of the crime of assault with a deadly weapon in the terms of CALJIC No. 604.

"This instruction might have been understood by the jury in either of two ways. First, the jury might have concluded therefrom that it should find defendant guilty of second degree murder if it *first* found that defendant harbored malice aforethought and *then* found that the homicide had occurred in the perpetration of the crime of assault with a deadly weapon. If the jury had understood the instruction in this way it would have misconceived the doctrine of second degree felony murder as we have explained it above. Second, if the jury derived from the instruction the correct meaning of the doctrine in question, it would have concluded that it should find defendant guilty of second degree murder if it found only that the homicide was committed in the perpetration of the crime of assault with a deadly weapon. This, the proper understanding of the instruction (See *People* v. *Phillips, supra,* 64 Cal.2d 574, 584, fn. 9 [51 Cal.Rptr. 225, 414 P.2d 353]), would have relieved the jury from a specific finding of malice aforethought."

In *Ireland,* as amended on rehearing, the court says at page 539:

"We have concluded that the utilization of the felony-murder rule in circumstances such as those before us extends the operation of that rule 'beyond any rational function that it is designed to serve.' (*People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130].) To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second

degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged.[14]"

█ Among other claims of error is the contention that the admission on rebuttal of June's telephone statement to her lawyer's secretary four days before the shooting, "that the gun was missing from the closet and she was afraid her husband was going to kill her" was inadmissible. This statement was admitted to show June's state of mind. The quoted statement does show "primarily the then state of mind of the declarant and not the state of mind of the accused" (*People v. Hamilton,* 55 Cal.2d 881, 893 [13 Cal.Rptr. 649, 362 P.2d 473]). The jury was instructed that it could not be considered as evidence of the asserted fact that the gun was missing. Appellant's counsel objected on the ground that this evidence was hearsay.

To determine whether this evidence was properly admitted on rebuttal we must analyze the issues.

The charge was murder and the prosecution's case in chief developed a prima facie case.

The record indicates that the primary thrust of the defense was diminished capacity. However, ancillary to diminished capacity was self-defense. An instruction was given on self-defense. If appellant had accepted the prosecution's version of the shooting and rested its defense solely on diminished capacity, the evidence above recited would have been improper. (*People v. Ireland, supra,* 70 Cal.2d 522, 528-532.)

However, appellant testified that when he went into the

---

"[14]In *People v. Marshall* (1957) 48 Cal.2d 394 [309 P.2d 456], we held that an offense was 'necessarily included' within the offense charged, within the meaning of section 1159 of the Penal Code, when the lesser offense *either* was embraced within the statutory definition of the greater *or* was embraced within the specific allegations of accusatory pleading. In *People v. Lewis* (1960) 186 Cal.App.2d 585 [9 Cal.Rptr. 263], the court, discussing the effect of *Marshall* upon facts there at bench, properly concluded that '. . . if the indictment in this case had charged murder with a hatchet, then assault with a deadly weapon, or with means likely to cause great bodily harm would be necessarily included offenses.' (186 Cal.App.2d at p. 600.) The rule set forth in *Marshall* and explained in *Lewis*, which relates to whether an offense is 'necessarily included' within the meaning of section 1159, is not affected by the rule which we now enunciate, the application of which is limited to the determination of whether a second degree felony-murder instruction is warranted under the evidence. *Marshall* and *Lewis* do show, however, that an offense may be included *in fact* within the offense charged even though it is not embraced within the statutory definition of the greater offense."

kitchen June was sitting at a phone counter between the kitchen and the family room, talking to her friend and had a gun in her right hand pointed at him. He lunged for the gun, which went off in the struggle, (a classic instance of self-defense).

In rebuttal the prosecution offered testimony of the secretary of June's attorney that June had telephoned the secretary four days earlier declaring that the gun which had been kept in the closet was missing and that she was afraid appellant was going to kill her.

Appellant's testimony that June had a gun pointed at him introduced the issue of who assaulted whom.

A factor bearing on this issue is June's state of mind prior to the time she was killed, and the likelihood of her having taken aggressive action against appellant. If June were afraid of appellant and fearful that he might kill her, then an inference could be drawn that it was unlikely she would do anything to provoke him and unlikely that she would produce a loaded firearm at a time when appellant was angry and had just quarreled with her. Because of the defense of self-defense June's state of mind and the probability that she would attempt to assault appellant became relevant and the evidence became admissible on the issue of June's state of mind and her thoughts and beliefs on the subject of violence from appellant. June's conversation with her lawyer's secretary indicated (1) she feared appellant, and (2) one of the reasons she feared appellant was that she thought the gun was missing from the closet.

We think the conversation is admissible as an exception to the hearsay rule to show June's state of mind, which in turn was relevant to the likelihood she would assault appellant with a loaded gun just after a heated quarrel. The inference drawn by the prosecution, of course, is that appellant's story of self-defense is not credible because of the unlikelihood, in view of June's state of mind, that she would have assaulted appellant.

This, of course, is not the only inference that could be drawn. It could be argued that since June was afraid of appellant she had perhaps resolved to kill him before he killed her. It could be argued that June knew that the gun was located in the closet, that she planned to shoot appellant with it, and concocted the story of the missing gun as part of *her* plan to establish self-defense. Evaluation of such contradictory inferences is, of course, a matter for the jury, but in view

of the defense offered in this case the conversation became admissible evidence as part of the rebuttal.

At least three cases have squarely stated that such evidence is relevant when such an issue is raised by the defense. The recent case of *Ireland* carefully points out that self-defense had not been raised in that case.

In *People* v. *Lew*, 68 Cal.2d 774 [69 Cal.Rptr. 102, 441 P.2d 942], the charge was murder of the defendant's girl friend; the defense was that the girl friend had been playing with the gun and the gun went off accidentally. In rebuttal, the prosecution introduced a statement of the girl friend that the defendant had threatened to kill her which was offered to show the victim's state of mind at the time of her death. The court held the evidence inadmissible, carefully pointing out, however, that if the defendant had claimed self-defense, then her state of mind and fear would have been a factor which would have made the testimony admissible.

Such was the ruling in *People* v. *Atchley*, 53 Cal.2d 160, 172 [346 P.2d 764]. The charge was first degree murder of the wife. The defense put in evidence that the wife said she wanted to kill the defendant and had threatened him with the gun and the defendant testified that he had seized the gun from the wife and in the struggle the gun went off.

In rebuttal, the prosecution produced a statement of the wife two days before her death that defendant had threatened her and that she was afraid. The court ruled this evidence was admissible and stated: "It tended to prove her fear of defendant, which was relevant to defendant's claim that she was the aggressor in a struggle for the gun. Since the claim of self-defense was raised as part of the defendant's case, the letter was admissible in rebuttal."

The same result was reached in *People* v. *Finch*, 213 Cal. App.2d 752, 766 [29 Cal.Rptr. 420]. The charge was murder of the wife. The defense: the wife produced a gun; defendant tried to take it away from her; the gun went off by accident. In rebuttal, the prosecution produced evidence of statements of the wife that she feared for her life and her declarations of specific threats, attempts to kill, and assault by the husband. The court held the statements were admissible to show the decedent's state of mind of fear of the defendant, all of which directly bore on the unlikelihood that she would assault her estranged husband with a gun.

In *People* v. *Ireland*, the charge was murder, and the prosecution evidence indicates that after a quarrel the defendant

got his gun and fired three shots at his wife while she was lying on a sofa. In defense, the husband testified that he had no memory of the shooting, and the court stated he necessarily accepted the prosecution's version of the physical facts of the shooting. In rebuttal, the prosecution produced evidence that that morning the decedent told a witness on the telephone, ''I know he's going to kill me. I wish he would hurry up and get it over with. He'll never let me leave.'' This was offered to show the wife's state of mind and to establish the probability that she would do nothing to provoke her husband. The defense argued that the wife's state of mind was not relevant because the husband had not testified to any aggressive conduct on the part of the wife. The court accepted this argument, pointing out that the defense had not raised any issue of fact with respect to the wife's conduct immediately preceding her death and in so doing distinguished *People* v. *Atchley, supra,* and *People* v. *Finch, supra,* on the ground that in the latter cases there had been a claim of self-defense.

At bench the claim of self-defense is an integral part of the defense. For that reason the evidence was properly admitted. The same conclusion was reached by another division of this court in *People* v. *Livingston,* 271 Cal.App.2d 628 [77 Cal. Rptr. 53], filed April 22, 1969, in which comparable evidence was held properly admissible on rebuttal as bearing on the decedent's state of mind and the likelihood that she would assault the defendant with a gun.

Other assignments of error are without merit. Since the case must be retried, we treat those which may recur briefly.

Appellant contends prejudicial remarks were made to the jury.

We find no remarks in either the opening or closing argument of the prosecutor which constitute prejudicial misconduct.

We are of the opinion that the evidence was thoroughly and properly argued to the jury.

We discuss typical remarks which appellant considers flagrant.

▮ The prosecutor referred to Dr. Davis, one of the psychiatrists, testifying for appellant, as a ''fortune teller,'' ''swami,'' as one who conducts his practice from a gypsy tearoom and one who was more of an advocate and ''less than a doctor in this courtroom.''

. No objection was made to any of these statements by appellant.

■ Appellant complains because the prosecutor remarked that appellant had experts available for 10 minutes testimony for a $250 fee. The fees referred to were part of the record. These references did not constitute misconduct. There was no objection. The remark was based on testimony and made in part to counter arguments made by appellant, stressing the great resources of the prosecutor as compared to that of appellant. (See *People* v. *Hill,* 66 Cal.2d 536, 560-561 [58 Cal.Rptr. 340, 426 P.2d 908]; *People* v. *Karman,* 145 Cal.App. 2d 801, 804 [303 P.2d 71].)

■ Prosecutors are allowed a wide range of descriptive comment and appropriate characterizations reasonably warranted by the evidence. (*People* v. *Wein,* 50 Cal.2d 383, 396 [326 P.2d 457]; *People* v. *Terry,* 57 Cal.2d 538, 561-562 [21 Cal.Rptr. 185, 370 P.2d 985]; *People* v. *Mitchell,* 63 Cal.2d 805, 809 [48 Cal.Rptr. 371, 409 P.2d 211].) ■ The prosecutor may state to a jury various conclusions he draws from the evidence and may make it clear to the jury what conclusions, in his opinion, should be drawn, so long as he keeps within the scope of conclusions which he argues within the evidence. (*People* v. *Eggers,* 30 Cal.2d 676, 693 [185 P.2d 1].)

Dr. Davis was asked to give his opinion as to whether or not it was possible that appellant would kill again. He answered, "I don't believe he could kill again, no . . . or that he would." He was asked his reasoning, and answered, "For all the reasons I have just given, plus the fact that he had been through this experience which makes it impossible that the same circumstances ever be repeated. There are other outs for him, and would be consistent with his personality, and one of them would be suicide, and another would be going into psychosis, which would be in a sense a running away from the whole matter, a withdrawal away from it."

In the practice of psychiatry, there has been noted support for the proposition that prediction of violence or lack of it is a difficult, uncertain task.

Characterization of evidence is proper. (*People* v. *Romero,* 143 Cal. 458 [77 P. 163]; *People* v. *Swigart,* 80 Cal.App. 31 [251 P. 343].)

The prosecutor at bench did not merely indulge in conclusion or characterization. He fortified his remarks with evidence based on the record and reasonable inferences therefrom. (*People* v. *Baker,* 207 Cal.App.2d 717, 723 [24 Cal.Rptr. 691].)

We are not persuaded that any of the characterizations made by the prosecutor in respect of the characterization of the expert or his testimony was calculated to·or did mislead and. prejudice the jury. (*People* v. *Beivelman,* 70 Cal.2d 60, 76 [73 Cal.Rptr. 521, 447 P.2d 913].)

█ Further, there is no showing that there was any bad faith or mental or moral dishonesty on the part of the prosecutor. The language of the court in *Beivelman* is apposite.· There, the court says at page 75:

"The conduct complained of by defendant here was not misconduct, for 'misconduct', as indicated above, implies a dishonest act or an attempt by an attorney to persuade the court or jury by the use of deceptive or reprehensible methods."

█ Appellant· contends that he was deprived of a fair trial because the verdict forms given to the jury did not include forms by which appellant could be found not guilty of any degree of murder, except murder one, 'nor guilty of a misdemeanor in violation of Penal Code, section 417 (exhibiting a firearm) or Penal Code, section 245, subdivision (a) (assault with a dangerous weapon). The objection in reference to Penal Code, section 245, subdivision (a) is not well taken, as follows from the above discussion. The objection in respect to Penal·Code, section 417 is similarly deficient, since, if appellant had 'committed a violation of section 417, he would automatically have been guilty of involuntary manslaughter and the jury was properly instructed on that subject. The trial court gave the jury a verdict form for every possible verdict under the facts of the case. There were guilty verdict forms for murder and each of the necessarily included· homicide· crimes and a murder not guilty verdict form for the only crime that was charged.

We find no error connected with the giving of verdict forms to the jury. █ In any event, the presumption is ,as stated in *People* v. *Hill,* 116 Cal. 562, 570 [48 P. 711], that if a jury is properly instructed, it will reach a proper verdict and write one or ask for one irrespective of whether they have all the verdict forms.

█ Appellant asserts that the record does not show that he was told by the court he had the right to 20 peremptory challenges. (Pen. Code, § 1070.) Appellant did exercise nine. He then accepted the jury. Penal Code, section 1070 does not require the court to specifically inform a defendant of this right and we know of no case which requires it.

■ Appellant's contention that he was deprived of his rights under the Sixth and Fourteenth Amendments of the United States Constitution to trial by an impartial jury by removal of a juror because of conscientious scruples against the death penalty, has been decided against him. It is not involved as he was convicted of second degree murder. (*Bumper* v. *North Carolina*, 391 U.S. 543-545 [20 L.Ed.2d 797, 800-801, 88 S.Ct. 1788] ; *People* v. *Gonzales*, 66 Cal.2d 482, 497-499 [58 Cal.Rptr. 361, 426 P.2d 929].)

■ Appellant contends that it was error to permit the victim's mother to testify in rebuttal that in June of 1964, while appellant and the decedent were separated for the first time, appellant had told decedent's mother that if he could not have decedent he would fix it so no one else could. Appellant contends that the testimony was too remote and was in answer to a leading question. There was no objection to the question and no motion to strike the testimony. Appellant, as part of his defense raised the issue of diminished capacity and affirmatively, as a part thereof, had gone into his psychiatric history over a 10-year period. On this state of the record, there was no error in its admission.

■ Appellant contends that the testimony of rebuttal witness Dr. Karl O. Von Hagen should not have been admitted for lack of proper foundation.

Sections 801 through 805 of the Evidence Code provide for the testimony of an expert psychiatrist and permit an opinion by such an expert based upon reports and opinions of other physicians. Appellant made no objection to this testimony, but asserts that since no interview was conducted with appellant, lack of foundation was so obvious that the trial court on its own motion should have held this witness incompetent to testify.

This contention is without merit.

■ Appellant's contention that it was error to exclude Exhibit 25 from the evidence is not persuasive. The exhibit was withdrawn at the prosecutor's request.

Exhibit 25 is a crime report, containing statements attributed to the maid, Inger, ostensibly prepared by an Officer Gould. Appellant asserts there were inconsistencies between this report and Inger's testimony. There were some, but they were of a miniscule nature. It was never established who took down the information; who spoke to the maid, whether the writer of the report spoke to the maid or merely summarized information obtained about the crime from someone else, or

whether the statements in the report were true and accurate statements made by the witness. The officers supposed to have made the entries, denied making them.

A foundation for this report as competent evidence was never established. Inger was nevertheless cross-examined on every facet of her testimony and in respect of Exhibit 25. Under these circumstances the withdrawal of Exhibit 25 was of no consequence. In our opinion, it was properly withdrawn.

Appellant further contends that the complaint filed in the municipal court did not state facts sufficient to provide the magistrate with sufficient information to issue a warrant for appellant's arrest, and by reason thereof, all subsequent proceedings in the case were without color of law. (*People* v. *Sesslin*, 68 Cal.2d 418, 425-426 [67 Cal.Rptr. 409, 439 P.2d 321].) The complaint on information and belief charges the crime of murder was committed by Louis Schindler. It is vague and subject to criticism. However, no objection was made at the preliminary hearing or the trial. (Cf. *People* v. *Butler*, 64 Cal.2d 842, 844 [52 Cal.Rptr. 4, 415 P.2d 819].) Obviously, no solid purpose could have been served by an objection.

The judgment is reversed.

Herndon, J., and Fleming, J., concurred.

A petition for a rehearing was denied June 27, 1969, and respondent's petition for a hearing by the Supreme Court was denied July 30, 1969.